# LANKFORD *v.* IDAHO

No. 88–7247.   Argued February 19, 1991—Decided May 20, 1991

STEVENS, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, O'CONNOR, and KENNEDY, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE and SOUTER, JJ., joined, *post*, p. 128.

*Joan Marie Fisher* argued the cause for petitioner. With her on the briefs was *Timothy K. Ford*.

*Larry EchoHawk*, Attorney General of Idaho, argued the cause for respondent. With him on the brief were *James T. Jones*, former Attorney General, and *Lynn E. Thomas*, Solicitor General.

JUSTICE STEVENS delivered the opinion of the Court.

We granted certiorari to decide whether the sentencing process followed in this capital case satisfied the requirements of the Due Process Clause of the Fourteenth Amendment.[1] More narrowly, the question is whether, at the time of petitioner's sentencing hearing, he and his counsel had adequate notice that the judge might sentence him to death.

The unique circumstance that gives rise to concern about the adequacy of the notice in this case is the fact that, pursuant to court order, the prosecutor had formally advised the trial judge and petitioner that the State would not recommend the death penalty. To place this circumstance in

---

[1] "No State shall . . . deprive any person of life . . . without due process of law." U. S. Const., Amdt. 14, § 1.

proper perspective, it is necessary to relate the procedural history of the case.

## I

On or about June 21, 1983, Robert and Cheryl Bravence were killed at their campsite near Santiam Creek, Idaho. On December 1, 1983, the State filed an information charging petitioner with the crime of first-degree murder. The first count alleged that Robert Bravence had been beaten to death and the second count alleged that Cheryl Bravence had been killed in the same way. Identical charges were also filed against petitioner's older brother, Mark. At the arraignment, the trial judge advised petitioner that "the maximum punishment that you may receive if you are convicted on either of the two charges is imprisonment for life or death." App. 14.

After the arraignment, petitioner's appointed counsel entered into plea negotiations with the prosecutor. During these negotiations, petitioner agreed to take two lie-detector tests. Although the results of the tests were not entirely satisfactory, they convinced the prosecutor that petitioner's older brother Mark was primarily responsible for the crimes and was the actual killer of both victims. *Id.*, at 193. The parties agreed on an indeterminate sentence with a 10-year minimum in exchange for a guilty plea, subject to a commitment from the trial judge that he would impose that sentence. In February 1984, the judge refused to make that commitment. In March, the case went to trial. The State proved that petitioner and his brother Mark decided to steal their victims' Volkswagen van. Petitioner walked into the Bravences' campsite armed with a shotgun and engaged them in conversation. When Cheryl left and went to a nearby creek, Mark entered the campsite, ordered Robert to kneel down, and struck him on the head with a nightstick. When Cheryl returned, Mark gave her the same order, and killed her in the same manner. See *State* v. *Lankford*, 113 Idaho 688, 691, 747 P. 2d 710, 713 (1987).

Petitioner testified in support of a defense theory that he was only an accessory after the fact.[2]    The jury was instructed, however, that evidence that petitioner "was present, and that he aided and abetted in the commission of the crime of robbery" was sufficient to support a conviction for first-degree murder.    App. 16.[3]    The trial judge refused

---

[2] The Idaho Supreme Court explained:

"Lankford's defense theory was that he was only an accessory after the fact.    Lankford testified in his own behalf and stated that he was dominated by his older brother who was a violent and dangerous person.    He testified that he thought his brother would merely knock out the Bravences, and he had not pointed the shotgun at them upon entering the camp.    He also testified that after the murders he was hysterical and remained in the van while his brother hid the bodies in the woods."    *State* v. *Lankford*, 113 Idaho 688, 692, 747 P. 2d 710, 714 (1987).

Petitioner testified, in part:

Mark "hit [Mr. Bravence] over the head with a thing about a foot long, which is a little club that he has had for a long time. . . . He hit him both times in the back of the neck actually.    Not in the head.    Kind of across, you know, across the neck in the back (indicating). . . . Next the lady came up.    Mrs. Bravence came up from the river and saw her husband laying there, and Mark told her to get on the ground. . . . Mark hit her apparently, it looked like to me, in the same place."    4 Tr. 705–707.

[3] "Based upon that statute, it is therefore not necessary that the State prove that this defendant actually committed the act which caused the death of the victims, provided the State prove beyond a reasonable doubt that the defendant was present, and that he aided and abetted in the commission of the crime of robbery as alleged, or that if he was not present, that he advised and encouraged the commission of such crime."    App. 16.

"If a human being is killed by any one of several persons engaged in the perpetration of the crime of robbery, all persons who either directly and actively commit the act constituting robbery or who with knowledge of the unlawful purpose of the perpetrator of the crime aid and abet in its commission, are guilty of murder of the first degree, whether the killing is intentional or unintentional.

"Thus, if two or more persons acting together are perpetrating a robbery and one of them, in the course of the robbery and in furtherance of the common purpose to commit the robbery, kills a human being, both the person who committed the killing and the person who aided and abetted him in the robbery are guilty of Murder of the First Degree."    *Id.*, at 17.

to instruct the jury that a specific intent to kill was required.[4] The jury found petitioner guilty on both counts.

At the prosecutor's request, the sentencing hearing was postponed until after the separate trial of petitioner's brother was concluded. The sentencing was first set for June 28, 1984, and later reset for October 1984. In the interim, pursuant to petitioner's request, on September 6, 1984, the trial court entered an order requiring the State to notify the court and petitioner whether it would ask for the death penalty, and if so, to file a statement of the aggravating circumstances on which it intended to rely.[5] A week later, the State filed this negative response:

> "COMES NOW, Dennis L. Albers, in relation to the Court's Order of September 6, 1984, and makes the following response.
>
> "In relation to the above named defendant, Bryan Stuart Lankford, the State through the Prosecuting At-

---

[4] 5 Tr. 833–834; 1 Record 239–242.

[5] The court order provided:

"IT IS HEREBY ORDERED AS FOLLOWS:

"(1) Sentencing is set for October 12, 1984 at 9 a.m.;

"(2) That on or before September 24, 1984 the State shall notify the Court and the Defendant in writing as to whether or not the State will be seeking and recommending that the death penalty be imposed herein. Such notification shall be filed in the same manner as if it were a formal pleading;

"(3) That in the event the State shall seek and recommend to the Court that the death penalty be imposed herein the following shall be filed with the Court on or before September 24, 1984:

"(a) The State shall formally file with the Court and serve upon counsel for the Defendant a statement listing the aggravating circumstances enumerated in Idaho Code § 19–2515(f) that it intends to rely upon and prove at the sentencing hearing to justify the imposition of the death penalty;

"(b) The Defendant shall specify in a concise manner all mitigating factors which he intends to rely upon at the time of the sentencing hearing.

"Dated this 6th day of September, 1984." App. 24–25.

A similar order had been entered in May, but it was, in effect, reentered when the original sentencing hearing was postponed.

torney *will not* be recommending the death penalty as to either count of first degree murder for which the defendant was earlier convicted." *Id.*, at 26 (emphasis in original).

In the following month there was a flurry of activity. The trial court granted petitioner's *pro se* request for a new lawyer, denied that lawyer's motion for a new trial based on the alleged incompetence of trial counsel, denied a motion for a continuance of the sentencing hearing, and denied the new lawyer's request for a typewritten copy of the trial transcript.[6] In none of these proceedings was there any mention of the possibility that petitioner might receive a death sentence.[7]

At the sentencing hearing on October 12, 1984,[8] there was no discussion of the death penalty as a possible sentence.

---

[6] The judge explained that because petitioner's counsel had the preliminary hearing transcript, the trial tapes, and the option of consulting with former defense counsel, she had "all of the information . . . that [she] need[ed] to adequately prepare for sentencing." *Id.*, at 60.

[7] The dissent relies on the judge's comment at the April 5, 1984, hearing, at which he had indicated that the death penalty was still a possibility, regardless of which sentence the State might ultimately recommend, see *post*, at 132, to support its argument that counsel should have known that the death penalty was still at issue. It should be noted not only that the judge's comment was made *prior* to the State's response of September 13, 1984, that it would not be seeking the death penalty, but also that the information was imparted to petitioner's former counsel. See Tr. of Oral Arg. 25–27. The information was never given to the counsel who actually represented petitioner during his sentencing and who was required to proceed without a transcript of the earlier hearing. See *id.*, at 43.

The dissent also suggests that petitioner should have been aware that the judge was still considering the death penalty as a possibility when he ordered a presentence investigation at the April 5, 1984, hearing, see *post*, at 132–133, but of course, that, too, was ordered *prior* to the State's response of September 13, 1984, in which the State confirmed that it would not be seeking the death penalty. Moreover, there is nothing unusual about ordering a presentence investigation prior to a sentencing.

[8] In Idaho, sentencing in both capital and noncapital cases is done by the trial judge alone. See Idaho Code § 19–2515 (1987).

The prosecutor offered no evidence. He relied on the trial record, explained why he had not recommended the death penalty,[9] and ultimately recommended an indeterminate life sentence with a minimum of "somewhere between ten and 20 years." *Id.*, at 104. The defense put on a number of witnesses who testified that petitioner was a nonviolent person, but that he was subject to domination by his brother Mark, who had violent and dangerous propensities. *Id.*, at 95–97. In her argument in mitigation, defense counsel stressed these facts, as well as the independent evidence that Mark was the actual killer. She urged the court to impose concurrent, indeterminate life sentences, which would make petitioner eligible for parole in 10 years, less the time he had already served. She argued against consecutive indeterminate sentences which would have amounted to a 20-year term, or a fixed-life term that would have amounted to a 40-year minimum. She made no reference to a possible death sentence.

At the conclusion of the hearing, the trial judge made a rather lengthy statement in which he indicated that he considered petitioner's testimony unworthy of belief and that the seriousness of the crimes warranted more severe punishment than that which the State had recommended. *Id.*, at 114–118. At the beginning of this lengthy statement, he described the options available to the court, including the inde-

---

[9] "Those things, all taken together, in my view and, apparently, in the jury's view, ultimately resulted in a death occurring as part of a robbery and makes Bryan guilty of murder in the first degree. If it were not for the Felony Murder Rule, there would be a difficulty in the proof in this case and in the conviction of Bryan Lankford, but it was, and that was the law. Bryan does stand, then, convicted of two counts of first degree murder for his participation. I tend to generally believe the witnesses from Texas, the family members, and I have believed this for a long time: That Bryan has traditionally been a pretty good person, except when he's been around Mark. Those are the reasons, the bottom line, what his family says about him as to why he would not and I would not and did not earlier recommend the death penalty, as the Court required, to be a filed document." App. 101–102; see *id.*, at 191.

terminate life sentence recommended by the State, "or a fixed life sentence for a period of time greater than the number of years he would serve on an indeterminate life sentence, i. e., ten. For example, a fixed term of 40 years or death or a fixed life sentence."[10] *Id.*, at 114. He concluded by saying that he would announce his decision on the following Monday.

On that Monday, the trial judge spent the entire day conducting the sentencing hearing in Mark's case. At 9:38 p.m., he reconvened petitioner's sentencing hearing. After a preliminary colloquy, he read his written findings and sentenced petitioner to death. These findings, some of which were repeated almost verbatim in his later order sentencing Mark to death, repeatedly reflected the judge's opinion that the two brothers were equally culpable.[11]

---

[10] He continued:

"So there are a great number of possibilities available to this Court with reference to sentencing in this case. The State and the defense have both suggested and requested that this Court impose an indeterminate life sentence or two indeterminate life sentences. The state has suggested that the Court consider letting those sentences run concurrently or together at the same time. I think one first must analyze what that would mean in this case. That sentence would result in Bryan Lankford being eligible for parole in less than ten years, considering the fact that he's served a considerable amount of time in the County Jail. In view of the recommendation or suggestion that I run the two sentences concurrently, the recommendation would be, in essence, that this Court sentence Bryan Lankford to spend, from this day, less than five years in the penitentiary for the murder of each one of the two Bravences, whose names have not yet been spoken today." *Id.*, at 114–115.

[11] For example:

"This court does not know how many blows were struck by Bryan Lankford or how many blows were struck by Mark Lankford. The evidence clearly demonstrates and this court finds that both Bryan Lankford and Mark Lankford committed acts of force and violence directly upon the persons of Mr. and Mrs. Bravence which acts directly and proximately caused the deaths of Mr. and Mrs. Bravence. The facts show that either Bryan Lankford or Mark Lankford could have prevented the deaths of Mr. and/or Mrs. Bravence." *Id.*, at 159.

Petitioner sought postconviction relief on a variety of grounds, including a claim that the trial court violated the Constitution by failing to give notice of its intention to impose the death sentence in spite of the State's notice that it was not seeking the death penalty. *Id.*, at 168. The trial court held that the Idaho Code provided petitioner with sufficient notice and that the prosecutor's statement that he did not intend to seek the death penalty had "no bearing on the adequacy of notice to petitioner that the death penalty might be imposed." *Id.*, at 200. Petitioner's request for relief on this claim was therefore denied. *Id.*, at 201.

In a consolidated appeal, the Idaho Supreme Court affirmed petitioner's conviction and sentence and also affirmed the denial of postconviction relief. On the notice issue, the court concluded that the express advice given to petitioner at his arraignment, together with the terms of the statute, were sufficient. *State* v. *Lankford*, 113 Idaho, at 697, 747 P. 2d, at 719.

One justice dissented from the affirmance of petitioner's sentence. *Id.*, at 705, 747 P. 2d, at 727. Relying on the absence of any contention that petitioner struck any of the fatal blows, and the fact that the evidence concerning petitioner's intent was equivocal, he concluded that the sentence was invalid under our decisions in *Enmund* v. *Florida*[12] and *Tison* v. *Arizona*,[13] as well as under the Idaho cases that the majority had considered in its proportionality review.[14]

---

[12] 458 U. S. 782, 801 (1982) ("For purposes of imposing the death penalty, [defendant's] criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt").

[13] 481 U. S. 137, 158 (1987) ("[M]ajor participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement").

[14] See, *e. g.*, *State* v. *Windsor*, 110 Idaho 410, 716 P. 2d 1182 (1985); *State* v. *Scroggins*, 110 Idaho 380, 716 P. 2d 1152 (1985); *State* v. *Beam*, 109 Idaho 616, 710 P. 2d 526 (1985); *State* v. *Fetterly*, 109 Idaho 766, 710 P. 2d 1202 (1985).

This Court granted certiorari, vacated the judgment, and remanded the case to the Idaho Supreme Court for further consideration in light of *Satterwhite* v. *Texas,* 486 U. S. 249 (1988). 486 U. S. 1051 (1988). On remand, by a vote of 3 to 2, the court reinstated its earlier judgment. 116 Idaho 279, 775 P. 2d 593 (1989). We again granted certiorari, 498 U. S. 919 (1990), to consider the question raised by the trial court's order concerning the death penalty and the State's response thereto.

## II

Before discussing the narrow legal issue raised by the special presentencing order and the State's response, it is useful to put to one side certain propositions that are not in dispute in this case. As a matter of substantive Idaho law, the trial judge's power to impose a sentence that is authorized by statute is not limited by a prosecutor's recommendation. Thus, petitioner does not argue that the State made a formal waiver that limited the trial judge's authority to impose the death sentence. The issue is one of adequate procedure rather than of substantive power. Conversely, the State does not argue that a sentencing hearing would be fair if the defendant and his counsel did not receive adequate notice that he might be sentenced to death. The State's argument is that the terms of the statute, plus the advice received at petitioner's arraignment, provided such notice. This argument would plainly be correct if there had not been a presentencing order, or if similar advice had been given after petitioner received the State's negative response and before the sentencing hearing commenced.

As a factual matter, it is also undisputed that the character of the sentencing proceeding did not provide petitioner with any indication that the trial judge contemplated death as a possible sentence. A hearing to decide whether the sentences should be indeterminate or fixed, whether they should run concurrently or consecutively, and what period of imprisonment was appropriate would have proceeded in exactly the

same way as this hearing did. Indeed, it is apparent that the parties assumed that nothing more was at stake. There is nothing in the record after the State's response to the presentencing order and before the trial judge's remark at the end of the hearing that mentioned the possibility of a capital sentence. During the hearing, while both defense counsel and the prosecutor were arguing the merits of concurrent or consecutive, and fixed or indeterminate, terms, the silent judge was the only person in the courtroom who knew that the real issue that they should have been debating was the choice between life or death.

The presentencing order entered by the trial court requiring the State to advise the court and the defendant whether it sought the death penalty, and if so, requiring the parties to specify the aggravating and mitigating circumstances on which they intended to rely, was comparable to a pretrial order limiting the issues to be tried. The purpose of such orders is to eliminate the need to address matters that are not in dispute, and thereby to save the valuable time of judges and lawyers. For example, if the State had responded in the affirmative and indicated an intention to rely on only three aggravating circumstances, the defense could reasonably have assumed that the evidence to be adduced would relate only to those three circumstances, and therefore, the defense could have limited its preparation accordingly. Similarly, in this case, it was surely reasonable for the defense to assume that there was no reason to present argument or evidence directed at the question whether the death penalty was either appropriate or permissible. Orders that are designed to limit the issues would serve no purpose if counsel acted at their peril when they complied with the orders' limitations.

It is, of course, true that this order did not expressly place any limits on counsel's preparation. The question, however, is whether it can be said that counsel had adequate notice of the critical issue that the judge was actually debating. Our

answer to that question must reflect the importance that we attach to the concept of fair notice as the bedrock of any constitutionally fair procedure. Justice Frankfurter eloquently made this point in *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U. S. 123 (1951):

> "Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, 'due process' is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process." *Id.*, at 162–163 (concurring opinion).

> "The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Id.*, at 170 (footnote omitted).

> "Man being what he is cannot safely be trusted with complete immunity from outward responsibility in depriving others of their rights. At least such is the conviction underlying our Bill of Rights. That a conclusion satisfies one's private conscience does not attest its reliability. The validity and moral authority of a conclusion largely depend on the mode by which it was reached. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generat-

ing the feeling, so important to a popular government, that justice has been done." *Id.*, at 171–172 (footnote omitted).

If defense counsel had been notified that the trial judge was contemplating a death sentence based on five specific aggravating circumstances,[15] presumably she would have advanced arguments that addressed these circumstances; however, she did not make these arguments because they were entirely inappropriate in a discussion about the length of petitioner's possible incarceration. Three examples will suffice to illustrate the point.

One of the arguments that petitioner's counsel could have raised had she known the death penalty was still at issue pertained to a concern voiced by the dissenting justice in the Idaho Supreme Court, who was troubled by the question whether Bryan Lankford's level of participation met the standard described in *Enmund* v. *Florida*, 458 U. S. 782 (1982), *Tison* v. *Arizona*, 481 U. S. 137 (1987), and several Idaho cases.[16] The dissenting justice described the major-

---

[15] The statutory aggravating circumstances, identified by the trial judge for the first time when he sentenced Bryan Lankford to death, were:

"(a) At the time the murder was committed the defendant also committed another murder . . . .

"(b) The murders of the Bravences were especially heinous, atrocious or cruel, and manifested exceptional depravity. . . .

"(c) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life. . . .

"(d) The murders were defined as murder of the first degree by Idaho Code Section 18–4003(d) and the murders were accompanied with the specific intent to cause the deaths of Mr. and Mrs. Bravence. . . .

"(e) The defendant, by prior conduct and by conduct in the commission of the murders at hand has exhibited a propensity to commit murder which will probably constitute a continuing threat to society." App. 156–157.

[16] See, *e. g.*, *State* v. *McKinney*, 107 Idaho 180, 186, 687 P. 2d 570, 576 (1984) ("The difference in the degrees of participation in the actual killing justifies the differences in the sentences"); *State* v. *Small*, 107 Idaho 504, 506, 690 P. 2d 1336, 1338 (1984) (Codefendants "had different backgrounds

ity's opinion as having mischaracterized the trial court's findings as to Bryan Lankford's state of mind. *State* v. *Lankford*, 113 Idaho 688, 706, 747 P. 2d 710, 728 (1987). The factual dispute over the record, combined with the dissenting justice's reliance on Idaho cases, demonstrates that petitioner failed to make an argument that, at least as a matter of state law, might have influenced the trial judge's deliberations. There was, however, no point in making such an argument if the death penalty was not at issue.

One of the aggravating circumstances that the trial judge found as a basis for his sentence was that the "murders of the Bravences were especially heinous, atrocious or cruel, and manifested exceptional depravity." App. 156–157. Even if petitioner had been the actual killer, it is at least arguable that the evidence was insufficient to support this finding.[17] If petitioner was not the actual killer, this finding was even more questionable. The point, however, is that petitioner's counsel had no way of knowing that the court was even considering such a finding, and therefore, she did not discuss that possibility at the sentencing hearing. It is unrealistic to assume that the notice provided by the statute and the arraignment survived the State's response to an order that would have no purpose other than to limit the issues in future proceedings.

In view of the fact that the trial judge's sentence appears to rest largely on his disbelief of petitioner's testimony[18] and

---

and played different parts in the commission of the crime. Under these circumstances, the disparity in the sentences was justified").

[17] "A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'" *Godfrey* v. *Georgia*, 446 U. S. 420, 428–429 (1980). "The petitioner's crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder. His victims were killed instantaneously." *Id.*, at 433 (footnote omitted).

[18] In his statement toward the end of the sentencing hearing, the judge described Bryan Lankford as follows: "[H]e is a liar, and he is an admitted liar. He's a deceitful individual." App. 116.

consequent conclusion that he was just as culpable as his brother, the omission of certain factual evidence takes on special significance. In her postconviction motion, petitioner's counsel represented that the results of two polygraph examinations demonstrated that petitioner was truthful in his testimony concerning his "lack of participation in, or knowledge of the killings." App. 170. Such evidence is inadmissible in Idaho in an ordinary case and therefore, appropriately, was not offered at the sentencing hearing. Petitioner argues, however, that under the teaching of our decision in *Lockett* v. *Ohio*, 438 U. S. 586 (1978),[19] such evidence would be admissible in a capital sentencing proceeding. Whether petitioner would ultimately prevail on this argument is not at issue at this point; rather, the question is whether inadequate notice concerning the character of the hearing frustrated counsel's opportunity to make an argument that might have persuaded the trial judge to impose a different sentence, or at least to make different findings than those he made.

At the very least, this is a case in which reasonable judges might differ concerning the appropriateness of the death sentence. It is therefore a case in which some of the reasoning that motivated our decision in *Gardner* v. *Florida,* 430 U. S.

---

[19] "[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U. S., at 604 (footnotes omitted).

"There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Id.*, at 605.

349 (1977), is applicable. In that case, relying partly on the Due Process Clause, of the Fourteenth Amendment and partly on the Eighth Amendment's prohibition against cruel and unusual punishment, the Court held that a procedure for selecting people for the death penalty that permits consideration of secret information about the defendant is unacceptable. The plurality opinion, like the opinion concurring in the judgment,[20] emphasized the special importance of fair procedure in the capital sentencing context. We emphasized that "death is a different kind of punishment from any other which may be imposed in this country." *Id.*, at 357.[21] We explained:

---

[20] In his opinion concurring in the judgment, JUSTICE WHITE made it plain that the holding in *Gardner* applied only in capital cases.

"The issue in this case, like the issue in *Woodson* v. *North Carolina*, [428 U. S. 280 (1976),] 'involves the procedure' employed by the State in selecting persons who will receive the death penalty. Here the sentencing judge indicated that he selected petitioner Gardner for the death penalty in part because of information contained in a presentence report which information was not disclosed to petitioner or to his counsel and to which petitioner had no opportunity to respond. A procedure for selecting people for the death penalty which permits consideration of such secret information relevant to the 'character and record of the individual offender,' *id.*, at 304, fails to meet the 'need for reliability in the determination that death is the appropriate punishment' which the Court indicated was required in *Woodson, supra*, at 305. This conclusion stems solely from the Eighth Amendment's ban on cruel and unusual punishments on which the *Woodson* decision expressly rested, and my conclusion is limited, as was *Woodson*, to cases in which the death penalty is imposed." 430 U. S., at 363–364.

The same limitation is applicable to our decision today.

[21] "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.) (footnote omitted).

"From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Id.*, at 357–358.

Although the trial judge in this case did not rely on secret information, his silence following the State's response to the presentencing order had the practical effect of concealing from the parties the principal issue to be decided at the hearing. Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure.[22]

---

[22] *Baldwin* v. *Hale*, 1 Wall. 223, 233 (1864) ("Common justice requires that no man shall be condemned in his person or property without notice and an opportunity to make his defense"); *In re Oliver*, 333 U. S. 257, 273 (1948) (due process requires that a person be given "reasonable notice of a charge against him, and an opportunity to be heard in his defense . . . to examine the witnesses against him, to offer testimony, and to be represented by counsel"). In a variety of contexts, our cases have repeatedly emphasized the importance of giving the parties sufficient notice to enable them to identify the issues on which a decision may turn. See, *e. g.*, *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314 (1950) (notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); *Armstrong* v. *Manzo*, 380 U. S. 545, 549–550 (1965) (failure to notify petitioner of pendency of adoption proceedings deprived him of due process of law); *Goss* v. *Lopez*, 419 U. S. 565, 579 (1975) ("students facing suspension . . . must be given *some* kind of notice and afforded *some* kind of hearing"); *Cleveland Bd. of Ed.* v. *Loudermill*, 470 U. S. 532, 546 (1985) ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story"). In the capital context, in which the threatened loss is so severe, the need for notice is even more pronounced.

Without such notice, the Court is denied the benefit of the adversary process. As we wrote in *Strickland* v. *Washington*, 466 U. S. 668 (1984):

> "A capital sentencing proceeding like the one involved in this case . . . is sufficiently like a trial in its adversarial format and in the existence of standards for decision . . . that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Id.*, at 686–687.

Earlier, in *Gardner*, we had described the critical role that the adversary process plays in our system of justice:

> "Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases." 430 U. S., at 360.[23]

If notice is not given, and the adversary process is not permitted to function properly, there is an increased chance of error, see, *e. g.*, *United States* v. *Cardenas*, 917 F. 2d 683, 688–689 (CA2 1990), and with that, the possibility of an incorrect result. See, *e. g.*, *Herring* v. *New York*, 422 U. S. 853, 862 (1975) ("The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free"). Petitioner's lack of adequate notice that the judge was contemplating the imposition of the death sentence created an impermissible risk that the adversary process may have malfunctioned in this case.

---

[23] See *Polk County* v. *Dodson*, 454 U. S. 312, 318 (1981) ("The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness").

The judgment of the Idaho Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SOUTER join, dissenting.

The Court holds that Lankford's due process rights were violated because he did not receive adequate notice that his sentencing hearing could result in the death penalty. I disagree.

I

Lankford knew that he had been convicted of first-degree murder, and Idaho Code § 18–4004 (1987) clearly states that "every person guilty of murder of the first degree shall be punished by death or by imprisonment for life." At arraignment the presiding judge, after reading aloud the substantive code provisions and describing the charges, told Lankford: "[T]he maximum punishment that you may receive if you are convicted on either of the two charges is imprisonment for life or death. Do you understand . . . ?" 7 Record 15. Lankford stated that he did. *Ibid.*

The Court's theory is that the unquestionable constitutional adequacy of this notice was destroyed by the judge's later order that the State indicate its intentions with regard to sentencing and the prosecutor's consequent statement that the State would not seek the death penalty. That theory would perhaps be correct if there was any reasonable basis for Lankford or his counsel to believe that the sentence could not exceed the prosecutor's recommendation. But plainly there was not.

The Idaho death penalty statute places full responsibility for determining the sentence upon the judge. It directs that "[w]here *the court* finds a statutory aggravating circumstance *the court shall* sentence the defendant to death *unless the court* finds that mitigating circumstances which may be

presented outweigh the gravity of any aggravating circumstance." Idaho Code § 19–2515(c) (1987) (emphasis added). Moreover, the finding of a statutory aggravating circumstance is not dependent upon any presentation by the prosecution. Under Idaho law, "[e]vidence admitted at trial shall be considered and need not be repeated at the sentencing hearing." § 19–2515(d). Anyone familiar with Lankford's case and Idaho law should have recognized immediately that the judge would necessarily find at least one statutory aggravating circumstance, for the jury's guilty verdict on the two separate murder counts established that, "[a]t the time the murder was committed the defendant also committed another murder," § 19–2515(g)(2).[1] Thus the judge would be bound *by law*, see § 19–2515(e), to weigh all mitigating and aggravating circumstances and to impose the death penalty *unless* the former outweighed the latter. Moreover, since an aggravating circumstance would necessarily have been found, in the event that Lankford did *not* receive the death penalty the court would be required to "detail in writing its reasons" for giving a lesser sentence. *Ibid.* No provision of the Idaho Code suggests that these duties placed upon the judge by § 19–2515 dissolve upon the State's recommending a lower sentence.

---

[1] Evidence at trial also established that the camping couple whom the Lankford brothers killed offered no provocation or resistance, that their skulls were brutally smashed while they were kneeling in a position of submission, that they were driven—dead or mortally injured—into a remote area where their bodies were hidden under branches and other debris and remained undiscovered until three months later. *State* v. *Lankford*, 113 Idaho 688, 691–692, 747 P. 2d 710, 713 (1987). Thus, reasonable defense counsel would also have anticipated that a sentencer might well find additional statutory aggravating circumstances, see Idaho Code § 19–2515(g)(5) (1987) (aggravating circumstance that the murder was "especially heinous, atrocious or cruel, manifesting exceptional depravity"); § 19–2515(g)(6) (aggravating circumstance that "the defendant exhibited utter disregard for human life").

Not only is Idaho statutory law clear on its face, but Idaho case law confirms it. In *State* v. *Rossi*, 105 Idaho 681, 672 P. 2d 249 (App. 1983), the defendant claimed an abuse of discretion when the trial court sentenced him to a term of imprisonment twice as long as the prosecutor had recommended. The Idaho Court of Appeals stated:

> "Our Supreme Court has . . . held that no prejudicial error resulted from a court's refusal to follow the [sentencing] recommendation of the jury. We hold that a trial court is also not bound by a sentence recommendation made by the state. . . . *The state's recommendation to the trial court is purely advisory.*" *Id.*, at 682, 672 P. 2d, at 250 (emphasis added).

*Rossi* was not a capital case, but nothing in any provision of the Idaho Code or in Idaho case law suggests that the rule in capital cases would be any different. Indeed, in *State* v. *Osborn*, 102 Idaho 405, 631 P. 2d 187 (1981), the Idaho Supreme Court found no error where a defendant was not informed whether the State would seek the death penalty, because "[w]hether the state would urge the maximum penalty or not was immaterial to the question of adequate notice to appellant that it was possible." *Id.*, at 413, 631 P. 2d, at 195.

The Court nevertheless holds that Lankford reasonably concluded from the judge's September 6 order and the State's response that the death penalty did not remain an issue. "The presentencing order," the Court says, "was comparable to a pretrial order limiting the issues to be tried." *Ante*, at 120. To say that is simply to assume the conclusion. Assuredly, despite the clarity of Idaho law, if the judge explicitly limited the issues to be considered at sentencing, or in some other way indicated that he would not exceed the prosecutor's recommendation, Lankford would have a case. But *was* it reasonable to view the September 6 order as "a pretrial order limiting the issues to be tried"? A pretrial order having such preclusive effect is typically entered pursuant to a rule or statute that says it will be preclusive. See, *e. g.*,

Fed. Rule Civ. Proc. 16(e). When an order is not entered pursuant to such a provision, as was the case here, one would expect the order itself to specify its preclusive effect, if any. But the present order said only that the prosecutor must state his intentions. It seems to me that the absolute limit of preclusion even *inferable* from that order was that the prosecutor, if he did not express the intention to seek the death penalty, would not be permitted to argue for it at the sentencing hearing. The consequence of that, of course, would be that the death penalty would be less likely to be imposed, since no one would be pressing it upon the judge and defense counsel's arguments against it would go unanswered. But neither explicitly in the order, nor as an inference of the order, nor even as a consequence of an inference, does it appear that the judge would be entirely *precluded* from imposing the death penalty. There was simply no basis for thinking that.

But perhaps it could be argued that, even though the judge was not legally bound by the prosecutor's recommendation against the death penalty, his entry of the order indicated he *intended* (contrary to Idaho law) to be bound, and that he should be held to that indicated intent by a sort of promissory estoppel. Even as a factual matter, that argument has no support. If the judge had entered the order on his own initiative, one might think, "Why else would he demand to know the State's position in advance unless he intended to accept it?" In fact, however, it was not the judge but defense counsel who asked that the State make its intentions clear.

> "MR. LONGETEIG: I wonder could the court fix a time in which the state would file a notice of its intention in respect to capital punishment. This would materially, depending on what he does, alter our course of action in this matter.
>
> .      .      .      .      .
>
> "THE COURT: I don't know that there is any provision that the state notify.

"MR. LONGETEIG: I'm not aware of any either. I think it would be a matter of the discretion of the court. But I would request that.

"THE COURT: Oh, well, Mr. Albers apparently doesn't have any objections to your request. He's indicated that, I think, as soon as he knows for sure what he wants to do, he'll tell you.

"MR. LONGETEIG: That's satisfactory.

"MR. ALBERS: And that will certainly be in plenty of time before the sentencing." 7 Record 55.

Not only did the judge give no indication that *he* wanted the State's recommendation because he would automatically accept it, but to the contrary he plainly indicated that, regardless of what the recommendation was, the death penalty *would be* at issue. Immediately following the colloquy quoted above, the record continues as follows:

"THE COURT: There obviously needs to be inquiry pursuant to 19–2515 as to the statutory aggravating circumstances that may exist regardless whether or not the state intends to pursue the death penalty." *Id.*, at 56.

The reference to a statutory "inquiry" is to Idaho Code § 19–2515(d) (1987), which provides that "[i]n all cases *in which the death penalty may be imposed,* the court shall, after conviction, order a presentence investigation . . . and shall thereafter convene a sentencing hearing for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense." (Emphasis added). Pursuant to that section the judge did order a presentence investigation—a step not required (or even specifically contemplated) by the Code except in death penalty cases. And the trial judge's reference to *statutory* aggravating circumstances itself shows that the death penalty re-

mained at issue, for only as to that penalty are qualifying aggravating circumstances specifically listed, see § 19–2515(g). [2]

In sum, it was clear that the death penalty remained at issue in the sentencing hearing, and there is no basis for the contention that the judge "misled" Lankford to think otherwise. Since that is so, today's decision creates a vast uncertainty in the law. If defendants are no longer to be held to knowledge of the law, or if their unreasonable expectations are henceforth to be the criteria of the process which is their due, the lawfulness and finality of no conviction or sentence can be assured. The defense created by the Court today will always be available, its success to be limited by factors we will presumably seek to identify in a series of future cases that will undertake the impossible task of explaining how much ignorance of the law, or how much unreasonableness of expectation, is too much.

## II

The Court believes, and I have assumed up to this point, that Lankford and his counsel did detrimentally rely upon the State's declaration, *i. e.*, that they *did* believe, albeit unreasonably, that the death penalty was foreclosed as a option at sentencing. It is far from clear, however, that that was so,

---

[2] The majority, *ante*, at 115, n. 7, notes that "the judge's comment was made *prior* to the State's response." I fail to see how that is relevant. The court's statement was that the death penalty procedures would be followed "*whether or not* the state intends to pursue the death penalty." 7 Record 56 (emphasis added).

As the Court also notes, *ante*, at 115, n. 7, Lankford obtained new counsel after this discussion. However, I think the knowledge of the first counsel (Mr. Longeteig) should be imputed to the second counsel (Ms. Fisher). It was obviously Ms. Fisher's duty to inform herself of all relevant circumstances, including the knowledge of Mr. Longeteig. That should not have been difficult, as the judge specifically ordered Mr. Longeteig to remain in the case and be at Ms. Fisher's "beck and call," 8 Record 25, to assist her in preparing for sentencing. If Ms. Fisher failed to ask him about the death penalty that cannot be labeled a due process violation attributable to the State.

134

and I do not believe that Lankford has carried the burden of establishing it.

The reality that the death penalty was not foreclosed as a matter of law was so clear—from the Idaho statutes, from the case law, and even from the judge's explicit statement that the death-sentence "inquiry" would have to be held—that it is difficult to believe counsel thought otherwise. Counsel clearly did *not* believe that the prosecutor's recommendation established the permissible maximum with regard to a sentence *less* than death. For though the prosecutor, who spoke first at the sentencing hearing, recommended the minimum sentence of life imprisonment with possibility of parole in 10 to 20 years, Lankford's counsel argued specifically against life imprisonment *without possibility of parole.* 8 Record 329. It is conceivable, I suppose, that counsel thought the judge possessed legal authority to exceed the prosecutor's recommendation in *that* respect but not in respect of imposing death; but the possibility of baseless belief that Idaho law contained such peculiar asymmetry is surely remote.

There remains, of course, the possibility that counsel genuinely (though unreasonably) believed, because of the September 6 order, that the death penalty had been precluded not in law, but as a *matter of the judge's intentions.* But there is some indication that even this was not so. The judge, in his lengthy statement at the end of the sentencing hearing—concluding with the announcement that he would not sentence immediately but would take the matter under advisement—stated that the available sentences included "[f]or example, a fixed term of 40 years *or death* or a fixed life sentence. So there are a great number of possibilities available to this Court." *Id.,* at 330 (emphasis added). If Lankford's counsel believed that the defense had been given assurance that the death penalty was (at least as a practical matter) out of the case, one would have expected a shocked objection at this point. None was made—though counsel was aggressive

enough in objecting to another portion of the judge's conclud-ing statement, two pages later in the transcript, that the judge interrupted with "Counsel, I'm not here to argue with you." *Id.*, at 332.

The only evidence supporting detrimental (albeit unreason-able) reliance is the fact that counsel's presentation at the sentencing hearing did not specifically address the death pen-alty. That is not terribly persuasive evidence, since all the arguments made against a life sentence or a minimum term of more than 10 years would apply *a fortiori* against a sentence of death. In any event, counsel's presentation was entirely consistent with (1) belief that the death penalty was not en-tirely ruled out, but simply an overwhelmingly unlikely pos-sibility, plus either (2) a tactical decision not to create the im-pression, by arguing the point, that that option was even thinkable, or (3) sheer negligence. If it was the last, Lank-ford may have a claim for ineffective assistance of counsel, which can be raised in a petition for habeas corpus. But he has not carried the burden of sustaining the claim made here.

\* \* \*

Because Lankford has not established that his counsel had any basis reasonably to believe that the death penalty was, either legally or as a practical matter, out of the case—and indeed he has not even established that his counsel *unreason-ably* believed that to be so—we have no cause to reverse the judgment of the Supreme Court of Idaho. In doing so, we seemingly adopt the topsy-turvy principle that the capital defendant cannot be presumed to know the law, but must be presumed to have detrimentally relied upon a misunder-standing of the law or a misinterpretation of the judge. I re-spectfully dissent.