719 A.2d 1288

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CURT THOMSEN, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 29, 1998—Decided December 1, 1998.

Before Judges KESTIN, WEFING and CARCHMAN.

*Michael N. Pedicini*, argued the cause for appellant (*Susan Brody*, Assistant Deputy Public Defender, with *Mr. Pedicini*, on the brief).

*Gary H. Schlyen*, Chief Assistant Prosecutor, argued the cause for respondent (*Ronald S. Fava*, Passaic County Prosecutor, attorney; *Mr. Schlyen*, of counsel and on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

Based on evidence of defendant's conduct on November 27, 1993, a jury found him guilty of eluding the police in a motor vehicle. The verdict sheet required the jury, upon a finding of guilt, "to indicate whether it is a 4th degree crime or a disorderly persons offense." The jury found "eluding (4th degree crime) creating a risk of death or injury to any person." *See N.J.S.A.* 2C:29–2b.

The indicated grading of the crime was erroneous. Although the offense was charged, prosecuted and given to the jury as a fourth degree matter, *N.J.S.A.* 2C:29–2b had been amended effective August 2, 1993 to classify it as a second-degree crime. None of the lawyer participants in the trial—not the judge, not the assistant prosecutor, not defense counsel—was aware of the effective date of the amendment until sentencing. As a result, the lay participants—the jurors and defendant—were misinformed that a fourth degree grading applied. When the error was discovered and presented to the trial judge, he considered the questions involved and entered a judgment of conviction memorializing defendant's conviction for a second degree crime, with a five-year prison sentence. Defendant appeals. We reverse.

Defendant had also been charged in the indictment with two other crimes, both of the third degree: aggravated assault, *N.J.S.A.* 2C:12–1b(5)(a), and criminal mischief, *N.J.S.A.* 2C:17–3(a)(1). The jury acquitted him of those charges. The trial court adjudicated defendant guilty on several related motor vehicle

charges. All but one were merged with each other and into the eluding conviction; a separate fine was assessed on the remaining offense, operating an unsafe motor vehicle.

The incident giving rise to the charges related to the issuance of a temporary restraining order against defendant pursuant to the Prevention of Domestic Violence Act of 1991, *N.J.S.A.* 2C:25–17 to –33. By the terms of the order, entered on November 24, 1993, defendant was prohibited from having any contact with his wife and was restrained from the marital home in Ringwood. Later that day, defendant appeared at the home of his wife's brother in Lincoln Park, where she was visiting. Defendant was arrested for violating the order and was released on bail. That charge was subsequently withdrawn.

Two days later, on the evening of November 26, defendant's wife saw him in the family car in front of the marital home. During the course of the evening, defendant made several attempts to telephone her. Defendant's mother-in-law, Mary Infantino, answered the phone each time and refused to permit defendant to speak with his wife. Because of defendant's presence in the vicinity of the home and the telephone calls, a report was made to the police.

Ringwood Police Officer Anthony Calabrese responded by coming to the home. Soon after arriving, he answered the ringing telephone but received no reply. Infantino answered the next call and told Calabrese that it was defendant calling. Calabrese communicated with his police colleagues, requesting that they look for defendant's car near any pay phone in the area.

Officer John Sowakinas, also of the Ringwood police, located defendant in the parking lot of a convenience store, talking on a pay phone from the driver's seat of his car. Defendant identified himself and stated that he was speaking with his girlfriend. Sowakinas ordered defendant out of the car. Defendant, testifying at trial that he was unnerved by Sowakinas's demeanor and use of profanity, responded by rolling up his car windows and

locking the door. Sowakinas attempted to call for backup assistance.

According to Sowakinas's testimony, while he was reaching into the patrol car to use the radio, defendant backed up his car and struck Sowakinas. Noticing that the back-up lights on defendant's car were lit, Sowakinas got into the police car and pulled out of the way. Defendant then rammed the police car, injuring Sowakinas further, and drove out of the lot with Sowakinas in pursuit. Sowakinas gave up the chase because of his concern for the condition of the patrol car, and communicated his difficulty by radio.

Defendant's account differed considerably from Sowakinas's. He testified that he moved his car only in an attempt to leave the lot, and that Sowakinas twice rammed it. Distraught and afraid, defendant then drove out of the lot in an attempt to reach his father's house in neighboring Wanaque.

Wanaque Police Lieutenant William Sullivan also testified. Responding to a radio dispatch shortly after midnight, he pursued defendant's car in a southerly direction, noting that it had a nonfunctioning headlight. At one point, Sullivan's radar device indicated defendant was traveling at seventy-one miles per hour in a thirty-mile-per-hour zone; thereafter, defendant increased his speed to 104 miles per hour. Sullivan testified that defendant was using the entire road during the chase, including the opposite, northbound, lane, forcing other cars off the road. After briefly losing sight of defendant's car, Sullivan relocated it, parked and empty, at the end of a side road. The left front wheel lacked a tire. According to Sullivan, "[i]t was ground right down to the road." While Sullivan was contacting his dispatcher to obtain a tracking dog, defendant emerged from nearby woods and surrendered.

Defendant, in his testimony, conceded that he had knowingly eluded the police, but he denied traveling at an excessive rate of speed or creating a risk of death or injury to anyone. He also denied striking either Sowakinas or the police car. Defendant

testified that his tire had been flattened when Sowakinas rammed his car, and that, therefore, he could not have exceeded the speed limit by much. He estimated his top speed to have been less than fifty miles per hour. Defendant also testified that two cars had pulled to the roadside in response to his flashing lights, but that no cars were forced off the road to avoid an accident.

During pretrial motions, the prosecutor asserted that although, by the time of trial, eluding by motor vehicle in a manner creating a risk of death or injury had been upgraded by amendment to a second degree crime, it was a fourth degree offense when it was committed. This misstatement elicited no comment from either the court or defense counsel. During a charge conference after the close of testimony in the five-day November 1996 trial, the court and counsel discussed the amendment to *N.J.S.A.* 2C:29–2b, but none of the participants was yet aware that it had been effective since August 2, 1993, more than three-and-one-half months before the November 26–27, 1993 events which generated the charges.

The problem became apparent to all remaining trial participants after the verdict had been rendered and the jury discharged. Prior to the scheduled sentencing date some two months following the verdict, the State moved in writing to amend the caption on the indictment. When the matter came before the trial court, the assistant prosecutor remarked that his colleague who had presented the case to the grand jury was unaware at the time that the statute had been amended several months before the offense was committed. Therefore, the caption on the indictment incorrectly specified the former, fourth degree, grading of the type of eluding charged. The trial prosecutor, as well as the trial judge and defense counsel in turn, stated that they, too, had been unaware of the effective date of the amendment. Both defendant and his counsel asserted that, had they known defendant was exposed to second degree criminal liability, they would either have dealt differently with a pre-trial plea offer based on charges of two third

degree crimes and one fourth degree crime, or would have adopted a different trial strategy.

The trial judge saw the issue as primarily a sentencing problem. In passing sentence, given the circumstances, he imposed the minimum five-year custodial term on defendant for the second degree crime, rather than the presumptive term of seven years. This, the trial judge noted, was an effort, in the light of statutory sentencing requirements for a second degree crime—which defendant's infraction manifestly was at the time committed—to achieve a balance between the presumptive seven-year term requested by the State, which the trial court found to be supported by the record, and the presumptive four-year sentence for a third degree conviction defendant would have received under the proposed plea bargain. In so ruling, the trial judge also expressly declined to exercise his discretion to sentence defendant as for a third degree crime. *See N.J.S.A.* 2C:44–1f(2).

 On appeal, defendant raises the following issues:

*POINT I* DEFENDANT, WHO PROCEEDED TO TRIAL AND CHOSE TO TESTIFY BASED ON ERRONEOUS INFORMATION THAT ELUDING WAS A FOURTH DEGREE OFFENSE WHEN IN FACT IT WAS A SECOND DEGREE OFFENSE, WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL. (*U.S. CONST.* AMENDS. V, VI, XIV; *N.J. CONST.* ART. 1, PAR. 10) (PARTIALLY RAISED BELOW)

*POINT II* DEFENDANT, WHOSE ATTORNEY FAILED TO PROPERLY ADVISE HIM THAT ELUDING WAS A SECOND DEGREE OFFENSE AT THE TIME HE COMMITTED IT, WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL. (*U.S. CONST.* AMEND. VI; *N.J. CONST.* ART. 1, PAR. 10)

POINT III THE COURT ERRED IN FAILING TO DEFINE "INJURY" IN ITS INSTRUCTION ON THE ELUDING CHARGE. (NOT RAISED BELOW)

Although defendant's arguments before the trial court on the first two points were presented in the context of sentencing, they embodied an attack on the validity of the trial itself and should have resulted in the declaration of a mistrial. The conviction for second degree eluding cannot stand for any one or more of several reasons.

■ We begin with the general principle that every person is entitled to know, with reasonable exactitude, the penal consequences of. any criminal charge he or she is called upon to defend against. *State v. Howard,* 110 *N.J.* 113, 124–25, 539 *A.*2d 1203 (1988). *See also Lankford v. Idaho,* 500 *U.S.* 110, 111 *S.Ct.* 1723, 114 *L.Ed.*2d 173 (1991) (due process of law was denied by the imposition of a death sentence when neither the defendant nor his counsel had notice of the possibility that such a sentence might be imposed); *Berger v. United States,* 295 *U.S.* 78, 55 *S.Ct.* 629, 79 *L.Ed.* 1314 (1935) (even an amendment to an indictment that does not alter an essential element of the charge may deprive a defendant of an opportunity to respond to the prosecution's case). *Cf. State v. Wein,* 80 *N.J.* 491, 497, 404 *A.*2d 302 (1979) (the indictment may not substantially mislead or misinform the accused as to the crime charged); *State v. Koch,* 161 *N.J.Super.* 63, 390 *A.*2d 1192 (App.Div.1978). As soon as it became apparent that the trial had been conducted under a misapprehension concerning the gravity of the crime charged, *i.e.,* the penal consequences to which defendant was subject, this defendant could not validly be convicted of a crime of greater degree than he, and everyone else involved, understood to be charged.

■ To the extent the trial judge soundly perceived that he could not ignore the statutory grading of the crime at the time it was committed, he could, as well, have dealt with the error which had pervaded the trial by invoking the doctrine of fundamental fairness as the basis for declaring a mistrial. *See Doe v. Poritz,* 142 *N.J.* 1, 108, 662 *A.*2d 367 (1995) (The doctrine of fundamental fairness " 'serves, depending on the context, as an augmentation of existing constitutional protections or as an independent source of protection[.]' ") (quoting *State v. Ramseur,* 106 *N.J.* 123, 373, 524 *A.*2d 188 (1987) (Handler, J., dissenting)); *State v. Koedatich,* 118 *N.J.* 513, 528–30, 572 *A.*2d 622 (1990); *State v. Yoskowitz,* 116 *N.J.* 679, 704–05, 563 *A.*2d 1 (1989); *Rodriguez v. Rosenblatt,* 58 *N.J.* 281, 277 *A.*2d 216 (1971); *State v. Currie,* 41 *N.J.* 531, 539, 197 *A.*2d 678 (1964) ("The primary considerations should be fairness

and fulfillment of reasonable expectations in the light of ... constitutional and common law goals."); *State v. Baker*, 270 *N.J.Super.* 55, 82, 636 *A.*2d 553 (App.Div.) (Kestin, J.A.D., dissenting.) ("[T]he concept of fundamental fairness trumps rules of law. [It] is designed to assure that due process values govern the outcome of criminal matters even 'when the scope of a particular constitutional protection has not been extended to protect a defendant.' * * * However sparing its application should be, ... the concept of fundamental fairness must be available for use when the result required by technisms does not square with considerations of decency and fair play.") (citations omitted), *aff'd* 138 *N.J.* 89, 648 *A.*2d 1127 (1994). *Cf. State v. Marshall*, 148 *N.J.* 89, 248, 690 *A.*2d 1 (1997) (" 'In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.' ") (quoting *Strickland v. Washington*, 466 *U.S.* 668, 696, 104 *S.Ct.* 2052, 2069, 80 *L.Ed.*2d 674, 699 (1984)); *State v. Howard, supra*, 110 *N.J.* at 124, 539 *A.*2d 1203 ("To a defendant the critical aspect of a guilty plea is the period of possible confinement. * * * The trial court's failure to inform a defendant of the [particulars] can result in manifest injustice, justifying vacating the plea.") (citations omitted).

■ The doctrine of fundamental fairness is not limited for use only by appellate courts as an instrument for remedying injustice. It exists, as well, for application by the trial courts themselves, in appropriate circumstances, as a mechanism for avoiding or correcting error in their own proceedings. The circumstances were appropriate here. The error was manifest and pervasive, its unfair effects were patent, and the doctrine of fundamental fairness was invoked by defendant in the argument on the State's motion to amend the indictment.

■ In a related vein, it is evident that defendant was inadequately counselled by reason of his trial attorney's lack of knowledge concerning the effective date of the change in grading which

the amendment had ordained. *See Lankford v. Idaho, supra,* 500 *U.S.* at 126–27, 111 *S.Ct.* at 1732–33, 114 *L.Ed.*2d at 187–89. Even if defendant was prejudiced in no other way by his attorney's lack of knowledge, he suffered significant disadvantage in his consideration of the proffered pre-trial plea offer when he was unaware of his potential criminal exposure in rejecting it.

We will not speculate whether or not defendant and his attorney would have adopted different trial strategies if they had had the requisite knowledge, as they argue they would, such as by invoking defendant's right not to testify; or whether such choices would likely have altered the outcome, *see Strickland v. Washington, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. It is beyond doubt that the misinformation concerning the grading of the offense charged worked directly in several ways to deny defendant the benefit of the adversary process. The United States Supreme Court has reflected on the consequences of such a shortcoming:

> Without such notice, the Court is denied the benefit of the adversary process. As we wrote in *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984):
>
> > "A capital sentencing proceeding like the one involved in this case ... is sufficiently like a trial in its adversarial format and in the existence of standards for decision ... that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Id.* at 686–687.
>
> Earlier, in *Gardner,* we had described the critical role that the adversary process plays in our system of justice:
>
> > "Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases." 430 *U.S.* [349,] 360, 97 *S.Ct.* 1197, 51 *L.Ed.*2d 393.[23]

---

[23] *Polk County v. Dodson,* 454 *U.S.* 312, 318, 102 *S.Ct.* 445, 70 *L.Ed.*2d 509 (1981) ("The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness").

If notice is not given, and the adversary process is not permitted to function properly, there is an increased chance of error, *see, e.g. United States v. Cardenas,*

917 *F*.2d 683, 688–689 (2nd Cir.1990), and with that, the possibility of an incorrect result. *See, e.g., Herring v. New York,* 422 *U.S.* 853, 862, 95 *S.Ct.* 2550, 45 *L.Ed.*2d 593 (1975). ("The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free"). Petitioner's lack of adequate notice that the judge was contemplating the imposition of the death sentence created an impermissible risk that the adversary process may have malfunctioned in this case.

[*Lankford v. Idaho, supra,* 500 *U.S.* at 127, 111 *S.Ct.* at 1733, 114 *L.Ed.*2d at 188–89.]

To the extent that the benefits of the adversarial process were compromised, the parallels between this case and *Lankford* and *Gardner* are inescapable. Defendant was denied a fair criminal process when misled before and during trial to believe that the sentence imposed could not be as grave as that which came to pass. *See also United States v. Day,* 969 *F*.2d 39, 42–44 (3d Cir.1992).

In the light of this determination, we need not decide whether the State's omission to inform the grand jury correctly as to the grading of the crime charged is, in itself, a sufficient basis for reversing on the ground that defendant was denied the right guaranteed by *N.J. Const.* art. I, ¶ 8. *See State v. Catlow,* 206 *N.J.Super.* 186, 195, 502 *A.*2d 48 (App.Div.1985), *certif. denied,* 103 *N.J.* 466, 511 *A.*2d 648 (1986).

Further, although this disposition renders moot defendant's argument based on *State v. Dorko,* 298 *N.J.Super.* 54, 688 *A.*2d 1109 (App.Div.), *certif. denied,* 150 *N.J.* 28, 695 *A.*2d 670 (1997), that the trial court erred in its instruction to the jury on the "injury" element of the eluding charge, we note nevertheless that the circumstances established in the proofs warranted nothing further in that regard than the trial judge's instruction contained. *See State v. Wallace,* 313 *N.J.Super.* 435, 440–42, 712 *A.*2d 1270 (App.Div.1998).

The conviction for second degree eluding is reversed and vacated. The matter is remanded.