IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 25, 2001 Session

## STATE OF TENNESSEE v. ANTHONY REID

**Direct Appeal from the Criminal Court for Bradley County**
**No. M-99-338      Carroll Ross, Judge**

**No. E2000-02619-CCA-R3-CD**
**July 20, 2001**

The defendant, Anthony Reid, was convicted by a Bradley County jury of first degree felony murder and especially aggravated robbery, Class A felonies, aggravated robbery, a Class B felony, attempted aggravated robbery, a Class C felony, and evading arrest, a Class E felony. Thereafter, the trial court sentenced Defendant to life imprisonment for his first degree murder conviction, twenty-five years for his especially aggravated robbery conviction, ten years for his aggravated robbery conviction, six years for his attempted aggravated robbery conviction, and two years for evading arrest. The trial court further ordered Defendant's sentence for life imprisonment to be served consecutively to his other four sentences, which were ordered to be served concurrently with each other, for an effective sentence of life plus twenty-five years. On appeal, Defendant contends that his convictions cannot stand because the State failed to comply with the mandatory procedures concerning proper presentation and filing of the indictment in his case as required by statute, and the trial court erred by refusing Defendant's request for a mistrial after the State improperly solicited testimony concerning the fact that Defendant invoked his right to remain silent upon arrest. Defendant also alleges that the trial court erred by imposing consecutive sentences. Following a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JERRY L. SMITH, J., joined.

William J. Brown, Cleveland, Tennessee, for the appellant, Anthony Reid.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; Jerry Estes, District Attorney General; Carl Petty, Assistant District Attorney General; and Steven Crump, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Facts

On May 22, 1998, Lebron Hensley, a patrolman for the Cleveland Police Department, received a report that a shooting had occurred at the apartment complex located at 580 Dooley Street in the city of Cleveland. The first officer to arrive at the scene, Hensley observed two gunshot victims on a balcony of one of the apartments. One victim was sitting in a chair and bleeding from the head. The other was lying on the floor face down in a pool of blood. Hensley immediately checked their condition. The victim in the chair was conscious but unresponsive--he was leaning over with his face in his hands and appeared to have been shot somewhere in the head. The victim on the ground exhibited no vital signs at all. Within a matter of minutes, the ambulance and additional officers arrived at the scene. The victims on the balcony were later identified as Kenneth Blair and Charles Massengill. Blair was the victim on the ground, and Massengill was seated in the chair. Hensley did not see any other victims at that time.

Barry Snyder, a paramedic working for Bradley County EMS, was a member of the emergency medical team called to the crime scene. When Snyder arrived, he found Massengill sitting in a chair with his head in his hands and what appeared to be a gunshot wound to his right eye. Another gunshot victim, Blair, was lying on the floor. Blair had been shot in the head and was in worse shape than Massengill. The medical team placed Massengill and Blair on backboards and then into the ambulance. By that time, Blair was in cardiac arrest. They performed CPR, but Blair died after arriving at Erlanger Hospital. Later that same day, the EMS team was called back to 580 Dooley Street to transport a third victim of the incident, Marcus Williams, to Bradley Memorial Hospital. Williams had complained earlier of a pain in his lower back and, upon closer inspection, it turned out that he had a bullet lodged in it.

Sergeant Randy Gates, an officer with the Cleveland Police Department, testified that he was the second or third officer to arrive at the scene. When he reached the upstairs balcony area, he observed Blair lying on the floor in "bad shape" and the other victim, Massengill, slumped over the railing with an eye wound. Because the balcony was congested with medical personnel, Gates decided to assist with securing the area downstairs. On his way he encountered two more victims: Eric Benion and Marcus Williams. Benion had been shot in the hand and Williams had gunshot wounds in his leg and back.

Once the victims were removed for medical treatment, Gates and the other police officers began interviewing witnesses and searching the area for evidence. The police located a set of keys belonging to one of the victims, several spent rounds of ammunition (later identified as .22 caliber shell casings), a baseball cap, and a bottle of some kind of alcoholic beverage in the gravel parking lot below the stairs. County officials reported spotting persons and a car matching the witnesses' description of the suspects and their vehicle: three black males in a small, white four-door car, with a "drive-out tag" in the rear window.

Jimmy Woody, a patrolman for the Bradley County Sheriff's Office, testified that he was one of the police officers involved in the pursuit of the shooting suspects. The chase began shortly after Officer Paul Leroy initially spotted the suspects' vehicle near the Waffle House on Georgetown Road. Leroy reported observing the vehicle drive onto Interstate 75, near exit 25, and he followed it for several miles while waiting for assistance. When the suspects reached exit 33, Woody was within a mile of Leroy and both officers activated their blue lights and sirens. The suspects responded by accelerating. They drove recklessly, at speeds of 70 to 80 miles per hour, constantly switching lanes and also traveling in the emergency lane. The chase continued for approximately two miles. Then the driver of the vehicle suddenly pulled over and stopped the car in the median on the left side of the interstate, between the Charleston exit and the river on the northbound side. The passenger in the front seat remained in the vehicle, but the driver and backseat passenger leaped out of the car and ran west toward the southbound lane. Sergeant Collins and Clancy Bryson, also involved in the pursuit, chased the fleeing suspects on foot. One was captured in the woods, and the other was apprehended sometime later near the truck stop at exit 33. Woody identified Defendant as the driver of the vehicle, but did not testify as to whether Defendant was the suspect captured in the woods or the one apprehended later, near the truckstop.

Sergeant John Collins, a patrolman for the Bradley County Sheriff's Office, testified that he also participated in the pursuit of Defendant. As the officers were closing in on the vehicle, Collins made eye contact with the driver, who grinned at him as he pulled alongside the suspects. Collins identified Defendant as the smiling driver and corroborated the testimony given by Officer Woody regarding the pursuit. Collins also confirmed that both he and Officer Bryson chased the two suspects who fled on foot. Apprehending the first suspect rather quickly, the officers then searched the woods with police dogs for the second but were initially unsuccessful. Upon returning to their units, a dispatcher informed them that someone from the truck stop at exit 33 reported a person matching the description of the missing suspect standing on the interstate trying to flag a ride. Detective Quinn drove to the exit and picked him up. During his testimony, Collins was not asked whether Defendant was the first suspect, apprehended in the woods, or the one discovered later at the truckstop.

Steve Bennett, a detective with the Cleveland Police Department, testified that he assisted with the search of the crime scene and the defendants' car after they were apprehended. At the scene of the shooting, the police found five .22 shell casings. Inside the car, the police discovered two boxes of .22 rimfire ammunition, a black stocking-type mask, a cap, and articles of clothing. Two days later, on Interstate 75, northbound, the police also discovered the three guns involved in the crime: a .22 caliber revolver pistol, a Phoenix .22 caliber semi-automatic pistol, and a Haskell .45 caliber semi-automatic pistol. Two of the weapons were wrapped in a black shirt, and the third was laying close by. The particular type of .22 revolver discovered on the interstate can hold six rounds in its chamber, and it contained five rounds when the police found it. The Phoenix .22 semi-automatic is capable of holding eight rounds, fully loaded, and it had five rounds remaining in the clip. (Bennett was not questioned about the status of the .45 weapon upon discovery.) The Tennessee Bureau of Investigation crime lab matched the five casings recovered from the crime scene to the Phoenix .22 semi-automatic handgun.

Detective Bennett testified that he first encountered Defendant and the codefendants, O'Neil Sanford (Defendant's half-brother) and Orlando Malone, at the Bradley County Sheriff's Department an hour or two after the shooting occurred. Upon searching the suspects, the police discovered approximately $40.00 in cash on Sanford and 79 cents or so in change on Malone. Defendant had no cash on his person. When Bennett was asked by the prosecutor whether he attempted to get a statement from Defendant and whether he cooperated, Bennett replied "Yes" and "No," respectively. Defense counsel objected. A bench conference was then held out of the presence of the jury. When the jury returned, the trial judge instructed them, inter alia, to ignore Bennett's response to the prosecutor's question concerning whether or not Defendant gave the police a statement.

During cross-examination, Bennett was asked whether he performed a gunshot residue test on Defendant and he responded affirmatively. He testified that propellant powder residue is normally present on the hands of a person who fires a weapon and that the residue test performed on Defendant gave inconclusive results. On redirect-examination, Bennett revealed that all three defendants were tested for powder residue and that the test results were all similarly "inconclusive." By way of explanation, Bennett read to the court the following excerpt from the TBI report concerning their test results: "some .22 rimfire ammunition does not have all the elements needed for gunshot residue analysis. These results cannot eliminate the possibility that the individual could have fired or handled a gun." Bennett testified that .22 ammunition does not contain the primer which is necessary for conclusive results in this type of test.

Eric Benion, one of the victims, testified that he was with Kenneth Blair, Marcus Williams, and Charles Massengill, at 580 Dooley Street on May 22, 1998, when the shooting incident occurred. Benion and Williams had started the evening at Benion's house. When Benion's girlfriend became argumentative, Williams and Benion left to go to Williams' apartment. As they were leaving, Massengill also showed up and they invited him along. Blair arrived at Williams' apartment later on. The men spent the majority of the evening sitting on the balcony talking and joking and drinking a few beers. They noticed three black women with three black men in the parking lot downstairs. One of the men (the codefendant, Malone) approached them, asking whether anyone had change for a fifty-dollar bill. They replied that they did not. Malone then asked whether they had an extra beer, but they did not have a spare beer either. Thereafter, Malone rejoined his friends, Sanford and Defendant, in the parking lot. It appeared to Benion as though they were leaving, but soon afterward they returned and ran up the stairs to where Benion and his friends were sitting on the balcony. Benion identified Defendant as one of the persons who ran up the stairs.

All three men--Defendant, Sanford, and Malone--had guns, and they ordered Benion and the others onto the floor. Benion did not obey right away, but ran back into the apartment. Malone found him and ordered him back outside with the others. Massengill was in a chair; the others were laying on the ground. With his gun pointed at Benion and Williams, Malone proceeded to look through their pockets for money. He took $28.00 from Benion. No one resisted or argued with the armed men during the robbery, but then Benion heard Blair mumble something unintelligible. In response, Benion heard one of the gunmen respond, "What? What?" and the shooting started. At this point, Benion jumped up, ran back into the apartment and leaped through the second story

window. When he landed, he ran to another apartment building and asked a friend to call the police. He had been shot in the hand during his escape. Benion gave the police a description of the shooters' car and a statement, and then identified Defendant from a lineup at the police department later that evening.

Marcus Williams testified that he resided in the apartment which became the scene of the shooting incident. Prior to the shooting, Williams and Benion were pitching horseshoes at Benion's house. When Benion and his girlfriend began to argue, they decided to go to Williams' apartment. Massengill arrived as they were leaving, so they invited him to come along. About an hour later, Blair joined them and they all had a few beers together. By this time, Sanford, Malone and Defendant were observed talking to some girls in the parking lot. Williams recognized the girls from the neighborhood, but had never seen the men before. Two of the girls came upstairs to where Williams and his friends were sitting on the balcony and asked whether anyone had a quarter. The three men followed them. Malone asked for a beer and whether anyone had change for a fifty-dollar bill. Williams told him that they had neither.

Williams testified that, after he refused Malone's requests, everything happened very quickly. The three men ordered Williams and his friends down onto the floor. All three carried guns. Williams saw what appeared to be two .22 caliber weapons and a .45 caliber handgun. Benion jumped up and ran into the house, but they made him come back outside. Then Defendant and Sanford searched the victims' pockets for money. Having taken their money, the gunmen were preparing to leave when Blair mumbled something that Williams could not understand. In response, one of them turned around and said "What?" Then the shooting started. Williams and Benion immediately jumped up and ran into the apartment. Benion leaped out the window and notified the police. Williams locked the door behind him, and stayed in the apartment until the ambulance arrived. He heard three more gunshots before the men left. When he emerged, he observed Massengill leaning over the rail and bleeding. Blair appeared dead. Benion had been shot in the hand as he escaped. Massengill had gunshot wounds in the knee and lower back

Williams further testified that none of the victims resisted the gunmen, and he identified Defendant as one of the three men who took part in the robbery. On cross-examination, Williams admitted that his blood alcohol level was 0.13 when the hospital tested him and that he drank three beers during the evening of the incident.

Charles Massengill, also a victim of the shooting, testified that he went to Williams' apartment after work at approximately 11:00 p.m. He was drinking beer with Benion, Williams, and Blair. They were not bothering anyone. The first person to approach them was Malone who wanted change for a fifty-dollar bill. When they told him that they did not have change, Malone went back downstairs but came back fifteen or twenty minutes later with Sanford and Defendant. Massengill observed that Defendant and Sanford had guns. Sanford made Massengill sit in a chair and pointed a gun at his right eye. Malone ordered Benion, Williams, and Blair outside onto the balcony and made them lie down face first. Defendant pointed his gun at Blair while the three men searched the victims' pockets for money. They took 79 cents from Massengill, and then Blair mumbled

something. Defendant responded with the words, "You say what?" and then shot Blair. Immediately afterward, Sanford shot Massengill in the right eye and he lost consciousness. He awoke later, in the hospital, with an eye injury and fractured neck. His blood alcohol was reported as 0.10.

The transcript of the stipulated testimony of Dr. Charles Harlan, a licensed pathologist who performed the autopsy on Kenneth Blair, was read into evidence by the attorneys during trial. Dr. Harlan's testimony revealed the cause of Blair's death was a gunshot wound to the right side of the head. Dr. Harlan was able to recover a small bullet from Blair's brain which was consistent with the size of bullet typically fired from a .22 caliber weapon. Dr. Harlan also performed a blood and urine analysis on the deceased which showed positive results for ethyl alcohol, "THC" or tetrahydrocannabinol (the active ingredient in marijuana), and benzoylecgonine (a metabolic by-product of cocaine). Specifically, the results indicated that the victim consumed the equivalent of one beer and a small quantity of cocaine prior to his death. By contrast, the quantity of THC in the victim's blood was fairly large.

Anthony Reid, the defendant, testified that he lived in Chattanooga, Tennessee, and admitted that he had previously been convicted for possession of cocaine with intent to sell. On the day of the shooting, Defendant had been out of jail for approximately five months. He and his half-brother, O'Neal Sanford, and a man named Orlando Malone had decided to come to Cleveland to visit a friend and sell drugs, specifically, crack cocaine. Defendant had approximately $250.00 worth of crack cocaine in his possession when they arrived in town. Shortly thereafter, they met some local girls who "wanted to drink or kick it" with them. Defendant testified that he and Malone were mainly interested in "getting drunk" and "having sex" at that point. The women asked Defendant and his companions to follow them to a grocery store near the apartment building at 580 Dooley Street, where the men proceeded to spend two and one-half hours talking with the women in the parking lot and selling drugs to passersby. Defendant noticed the crowd of people standing on the balcony of Williams' apartment, but they did not engage in any conversation.

After Defendant and his companions returned from renting a motel room at the request of the women, Malone went up the stairs near Williams' balcony "to get the females" who were waiting in an apartment nearby. On his return, he stopped to talk to Williams and his friends about something. Defendant testified that he did not know what the conversation was about and that no one appeared angry afterward. Defendant admitted that, at this point, he and his friends were intoxicated. Malone wanted the women to come to their motel room, but they told him they needed to make a phone call first. While the men waited for the women to return, Malone went back to ask the people at the Williams' apartment for a beer. When he came downstairs empty-handed, Sanford went back up the stairs with him. It started raining, so Defendant went upstairs also. When he reached the top stair, he heard arguing. Then "someone got pushed and a gunshot went off," so Defendant ran back downstairs to the car to "get out of the way."

Defendant testified that he had some difficulty getting the car to start. By the time he did, Sanford and Malone had jumped in the car with him and they all drove away. Defendant was

frightened because he was on probation and was supposed to stay out of trouble. When the police spotted them and tried to pull them over, Defendant "mashed" the accelerator in an attempt to escape. Sanford ducked down, and Malone wrapped the guns inside of his shirt. Malone instructed Defendant to pull over to the side of the highway so he could throw the guns out of the car, and Defendant complied. When Defendant finally stopped the car, he tried to get away on foot, but the police caught him and arrested him.

Defendant further testified that, to the best of his knowledge, Malone and Sanford did not rob anyone of anything on May 22, 1998, and, furthermore, Defendant did not know that Malone and Sanford had guns with them that day. Defendant also testified that he did not have a gun, he did not shoot anyone, and he did not rob anybody that evening. Defendant claimed his only interests centered on drugs and females.

On cross-examination, Defendant explained that, even though he had not done anything wrong, he ran from the police because he feared for his life. The Chattanooga police had recently killed one of his friends, and Defendant believed that the police might kill him too. With regard to the victims' testimony that Defendant carried a gun, he claimed that all three witnesses were either lying or must have confused him with someone else. Defendant claimed that he was far too busy running away to recall anything about the shooting incident, except for hearing gunshots.

## II. Analysis

### A. Indictment

Defendant contends that the State failed to comply with mandatory statutory procedures concerning proper presentation and filing of the indictment in his case and, therefore, his convictions cannot stand because the charging instrument had no legal effect. Specifically, Defendant claims that the record fails to show that the indictment was presented by the foreman to the court in the grand jury's presence in accordance with Tenn. Code Ann. § 40-13-108 and, further, that the indictment was not properly filed or entered by the clerk before the trial commenced as required by Tenn. Code Ann. § 40-13-109.

Tennessee Code Annotated section 40-13-108 provides the following: "An indictment, when found by the grand jury and endorsed as prescribed by this part, shall be presented by the foreman, in the grand jury's presence, to the court, and filed by the clerk." Tenn. Code Ann. § 40-13-108 (1997).

Tennessee Code Annotated section 40-13-109 further provides that

> All indictments for public offenses of the grade of felony, returned into court by the grand jury with the endorsement a "true bill," shall be entered by the clerk with the return in full on the minutes of the

court, and the originals compared with the entry by the judge before
the judge signs the proceedings of the day.

Tenn. Code Ann. § 40-13-109 (1997).

After a review of the record, we find Defendant's first allegation concerning the foreman's alleged failure to present Defendant's indictment to the court to be unfounded. On the third page of Exhibit 2, contained in Volume IV of the official "Transcript of the Evidence," a document dated August 18, 1999, and filed August 30, 1999, states the following:

> We, the Foreman and members of the said Grand Jury, have hereunder subscribed our names, thereby certifying our actions relative to the above, and we direct the foreman of the Grand Jury to present the above indictments, presentments and "No Bills," to the Judge of this Court in open Court.

The document was signed by the members of the Grand Jury, the foreman, and the Judge--all of the parties required to participate under Tenn. Code Ann. § 40-13-108. Moreover, the "Grand Jury Schedule and Report" of the same date includes Defendant's five count indictment in its listing, which indicates to this Court that it clearly was among those "directed for presentment" in the document above. According to the statute, nothing more is necessary. Even if the record reveals that the clerk omitted to enter upon the court's minutes that the grand jury returned Defendant's indictment into open court, this omission does not constitute reversible error if the indictment shows upon its back that it was found a "true bill," which it does. See Tenn. Code Ann. § 40-19-101 (1997); see also Glasgow v. State, 68 Tenn. 485 (Tenn. 1876) (failure to spread felony indictment upon the minutes of the court neither enlarges nor dismisses the accused's rights since the object of such procedure is simply to provide against consequences of loss or destruction of original); Brown v. State, 26 Tenn. 155 (Tenn. 1846) (failure to spread indictment upon minutes of the court and to include signature of grand jury foreman are immaterial when original indictment exists).

Defendant also alleges that the indictment was not properly filed or entered by the clerk before the trial commenced as required by Tenn. Code Ann. § 40-13-109. The record reveals that the official minute book of the court did contain a copy of Defendant's indictment. This fact was proven by the testimony of Tisha Huff, the deputy clerk for the Criminal Court for Bradley County, and conceded by defense counsel during his pre-trial argument on this issue. Specifically, defense counsel admitted to the court that "there was [a copy of the indictment] in the file, but it was not stamp-filed entered." Defendant's reliance on a stamp is misplaced, however. There is no such requirement. As stated above, the indictment in this case was "directed for presentment" in a document signed by the grand jury, the foreman, and the judge, after which a copy was placed in the official minute book of the court. This procedure was sufficient to comply with the statutory requirements for proper processing of an indictment on all points of legal significance. Defendant is not entitled to relief on this issue.

### B. Denial of Defendant's Right to Remain Silent

Defendant contends that the trial court erred by refusing Defendant's request for a mistrial after the State violated his constitutional rights by improperly soliciting testimony that Defendant failed to cooperate when a police officer requested a statement from him after his arrest. Defendant further asserts that the impropriety of the prosecutor's action constituted a level of prosecutorial misconduct that may only be cured by a reversal of his conviction.

In response, the State concedes that a defendant has a constitutional right to remain silent after his or her arrest and that, under most circumstances, the prosecutor may not comment at trial concerning the defendant's invocation of that right. The State also admits that the prosecutor's question was improper. However, the State contends that the matter, taken in its entirety, amounts to mere harmless error and, therefore, a mistrial is not necessary. In support, the State argues that the context within which the comment was made was such that a jury would not necessarily draw an inference of guilt from it. In addition, the State asserts that the prosecutor did not compound his error by referring to Defendant's silence a second time in its closing argument. However, the transcripts of the parties' closing arguments are not included in the record on appeal. Lastly, the State suggests that the curative instruction given by the trial court operated to remove the taint left by its improper remarks.

During the direct examination of Detective Steve Bennett regarding his first encounter with Defendant after his arrest, the following colloquy occurred:

> Prosecutor: Detective Bennett, did you attempt to get a statement at the time from Mr. Reid?
> Bennett: Yes.
> Prosecutor: Did he cooperate with you?
> Bennett: No, sir.
> Prosecutor: Excuse me?
> Bennett: No.

At this point, Defendant's counsel objected and requested permission to approach the bench. The jury was excused, and a bench conference was held during which Defendant requested that the judge declare a mistrial on the ground that the prosecutor improperly solicited commentary concerning Defendant's decision to exercise his constitutional right to remain silent. Following a discussion and arguments by counsel for both sides, the trial judge denied Defendant's motion for a mistrial, but sustained his objection to any further questions of a similar nature by the prosecutor. The trial judge also gave the following curative instruction to the jury when it returned:

> Ladies and gentlemen, before you stepped out, there had been a question asked pertaining to whether or not this particular defendant gave any statements at the time of the arrest to the officer. There was an objection raised. I have sustained the objection by defense counsel

-9-

as to that entire line of questioning, and I would advise you, ladies and gentlemen, everyone in our nation has an absolute right not to ever have to give any statement to any officer. It's called the Fifth Amendment of the United States Constitution. We have an equal amendment in our own state constitution. No one is ever compelled to have to give a statement to any officer. I have sustained the objection and I would urge you to strike any reference to that as far as the answer the officer gave to that particular question. And I would sustain any objection on any continued questioning along that line.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This Court will not disturb that decision absent a finding of an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "The purpose . . . is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In determining whether a "manifest necessity exists,"'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (citation omitted). For reasons which follow, we agree with the trial court's decision to deny Defendant's request for a mistrial.

A defendant's "constitutional right to remain silent in the face of accusations against him, not only during his trial but also upon arrest and while in custody, is a rule so fundamental as to require little elaboration." State v. Braden, 534 S.W.2d 657, 660 (Tenn. 1976) (citing U.S. Const. amend. V; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Under this principle, "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [the individual] stood mute or claimed his privilege in the face of accusation." Miranda, 384 U.S. at 468 n. 37; see also Braden, 534 S.W.2d at 660; State v. Mabe, 655 S.W.2d 203, 205 (Tenn. Crim. App. 1983); Honeycutt v. State, 544 S.W.2d 912, 917 (Tenn. Crim. App. 1976).

In Momon v. State, 18 S.W.3d 152, 163-65 (Tenn. 1999), our supreme court recognized that the harmless error doctrine applies to constitutional violations, including situations in which the prosecutor improperly commented upon a defendant's privilege against self-incrimination. See also State v. Transou, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996); Honeycutt, 544 S.W.2d at 917; (Tenn. Crim. App. 1976). A constitutional error will result in reversal "unless the reviewing court is convinced 'beyond a reasonable doubt' that the error did not affect the trial outcome." State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999) (citations omitted). Although we agree with Defendant and the State as conceded on appeal that the prosecutor's questioning was improper, applying the above analysis to the instant case we find the question to be harmless error.

-10-

First, we observe that the entire exchange at issue comprised only a small portion of the prosecutor's cross-examination of the detective and the evidence as a whole. During the trial, the State made out a strong case against Defendant, presenting substantial proof from which the jury could determine that Defendant was guilty of the offenses charged beyond a reasonable doubt. Defendant claimed that he was not directly involved in the robbery or the shooting, yet three eyewitnesses testified that he was present, with a gun, and that he actively participated in the robbery. One of the eyewitnesses actually observed Defendant shoot the victim who subsequently died. Defendant claimed that these eyewitnesses either committed perjury or mistakenly confused him with someone else, yet presented no reason for their collective bias or proof that anyone other than Sanford, Malone and Defendant were present. Evidence concerning the absence of any statement by Defendant at the time of his arrest must be weighed against the other, properly admitted evidence in order to determine its prejudicial effect on the minds of the jury. Viewing the record as a whole, we cannot find that the State's improper reference to Defendant's pretrial silence, made in one brief exchange during a two-day trial, had a prejudicial effect upon the jury's verdict, given the overwhelming evidence tending to establish Defendant's guilt. In addition, the trial court gave curative instructions, which we may presume were followed by the jury. State v. Locke, 771 S.W.2d 132, 139 (Tenn. Crim. App. 1988) (citing State v. Compton, 642 S.W.2d 745 (Tenn. Crim. App. 1982)). In sum, we conclude that the comments in issue constituted harmless error beyond a reasonable doubt. It follows that the trial judge did not abuse his discretion in refusing to grant a mistrial. Defendant is not entitled to relief on this issue.

### C. Consecutive Sentencing

Defendant also contends that the trial court erred when it imposed consecutive sentences because neither the trial court nor the State gave advance notice of its intent to seek same. Defendant argues that the failure to give such notice deprived him of his right to due process as guaranteed by both the United States Constitution and the constitution of Tennessee. We disagree.

In this case, the trial court's ability to impose consecutive sentences on Defendant is governed by Tenn. Code Ann. § 40-35-115. This statute places full responsibility for determining whether consecutive sentences are proper upon the trial judge. Specifically, it directs that where "a defendant is convicted of more than one (1) criminal offense, *the court* shall order sentences to run consecutively or concurrently as provided by the criteria in this section." Tenn. Code Ann. § 40-35-115(a) (1997) (emphasis added). The statute continues by stating that "*[t]he court* may order sentences to run consecutively if *the court* finds by a preponderance of the evidence" that any of the seven criteria enumerated in the statute apply. Id. § 40-35-115(b) (emphasis added). The imposition of consecutive sentences is not dependent upon any required notice from the prosecution. Neither does the statute require that a judge review information relevant to a defendant's sentence prior to the sentencing hearing in order to give a defendant "notice" of any kind.

In his brief, Defendant asserts that the United States Supreme Court "has repeatedly emphasized the importance of giving the parties [in a proceeding] sufficient notice to enable them to identify the issues on which a decision may turn" and cites Lankford v. Idaho, 500 U.S. 110, 126

(1991), in support of this statement. Defendant further contends that "without such notice, the court is denied the benefit of the adversary process." However, in Lankford, the petitioner's argument centered on the fact that the nature of the sentencing proceeding did not provide the petitioner with any indication that the trial judge contemplated death as a possible sentence. Id. at 119. Importantly, the Court observed that a hearing to decide sentencing matters, e.g., whether sentences should run concurrently or consecutively, would have proceeded in exactly the same way as the hearing in issue did. Id. Consequently, while counsel for both sides were arguing the merits of other aspects of sentencing, the judge was the only person in the courtroom who knew that the real issue that they should have been debating was the choice between life and death. Id. at 120. Since the counsel for petitioner did not have adequate notice of the critical issue that the judge was actually debating, i.e., that his sentencing hearing could result in the death penalty, the Court in Lankford determined that the petitioner's due process rights were violated. Id. at 127. The Court made no statement, nor did it infer, that a petitioner would be entitled to notice of sentencing procedures which are well-established, routine, and published by statute. We also observe that the facts in the instant case did not create the secret, one-sided type of proceeding which the Lankford Court found violative of the petitioner's constitutional due process rights. By contrast, Tennessee Code Annotated section 40-35-115 specifically enumerates what criteria the judge will examine when making a determination regarding consecutive sentences and, in doing so, also provides sufficient information so that a defendant may adequately prepare to argue against such sentencing if he so chooses.

Defendant also contends that his right to notice regarding the possibility of consecutive sentencing is specifically articulated in Article I, section 9, of the Tennessee Constitution and quotes the following passage from that section: "[I]n all criminal prosecutions, the accused hath the right to be heard by himself and his counsel; *to demand the nature and cause of the accusation against him* . . . ." Tenn. Const. art. I, § 9 (alteration in original). This constitutional provision does not support the interpretation proposed by defendant, however. It simply provides that the accused has the right to be informed, with some degree of certainty, of the crime of which he stands accused. Bosley v. State, 401 S.W.2d 770, 771 (Tenn. 1966). This was accomplished by Defendant's indictment, which we have examined and found satisfies the constitutional guarantees of notice to the accused according to the requirements outlined by our supreme court in State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). After due consideration, we hold that imposition of consecutive sentences according to the criteria established in our existing statutes and rules, including Tenn. Code Ann. § 40-35-115, without specific additional notice, does not violate a defendant's due process rights.

Furthermore, we find ample support in the record to sustain the trial court's sentencing determination under the criteria provided in Tenn. Code Ann. § 40-35-115. The transcript of the sentencing hearing reveals that the trial court found that the following were applicable in Defendant's case "by a preponderance of the evidence": (2) "[t]he defendant is an offender whose record of criminal activity is extensive," (4) "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high," and (6) "[t]he defendant is sentenced for an offense committed while on

probation." Tenn. Code Ann. § 40-35-115 (2), (4), (6) (1997). We concur with these findings. Defendant is not entitled to relief on this issue.

### III. Conclusion

Accordingly, the judgment of the trial court is AFFIRMED.

_____
THOMAS T. WOODALL, JUDGE