PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ISAAC JACKSON STROUD,
        *Petitioner-Appellant,*

v.

MARVIN POLK, Warden, Central
Prison, Raleigh, North Carolina,
        *Respondent-Appellee.*

No. 05-17

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CA-01-582-1-WLO)

Argued: September 19, 2006

Decided: October 23, 2006

Before WILKINSON, MOTZ, and TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Wilkinson and Judge Traxler joined.

---

## COUNSEL

**ARGUED:** Marilyn Gerk Ozer, William F. W. Massengale,
MASSENGALE & OZER, Chapel Hill, North Carolina, for Appel-
lant. Jonathan Porter Babb, Sr., NORTH CAROLINA DEPART-
MENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON
BRIEF:** Roy Cooper, Attorney General of North Carolina, Raleigh,
North Carolina, for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

A North Carolina jury convicted Isaac Jackson Stroud of first degree murder and recommended that he be sentenced to death. Stroud challenged his conviction and resulting death sentence in state court, unsuccessfully pursuing both a direct appeal and post-conviction relief. Stroud then filed this petition for a writ of habeas corpus in federal court. The district court denied habeas relief and denied Stroud's motion for a certificate of appealability. We, however, granted a certificate of appealability as to one issue, involving his challenge to the state court's rejection of his claim that North Carolina's "short-form" murder indictment provided inadequate notice that he could be convicted of first degree murder on a theory of torture. For the reasons that follow, we affirm the district court's dismissal of his habeas petition.

I.

North Carolina indicted Stroud using its "short-form" murder indictment, which simply charged that he "unlawfully, willfully and feloniously and of malice aforethought did kill and murder" his long-time girlfriend, Jocelyn Mitchell. The indictment noted on its face that it was sufficient to charge both first and second degree murder and cited to both the statute authorizing the short form, *see* N.C. Gen. Stat. § 15-144 (1983), and the state's murder statute, *see* N.C. Gen. Stat. § 14-17 (Cum. Supp. 1991).

The Supreme Court of North Carolina summarized the evidence presented at Stroud's trial:

At trial, the State presented evidence tending to show that Jocelyn Mitchell died on 1 May 1993 from dozens of blunt force injuries to her body. Defendant [Stroud] was in the apartment with the victim the night of the beating. John McPhatter, the defendant's next-door neighbor, and McPhatter's girlfriend, Debra Harper, each testified that on 1 May 1993, between 12:30 and 1:30 a.m., they awoke to

a loud thump from defendant's apartment. McPhatter and Harper also heard the defendant arguing and the victim talking and crying. They specifically heard the defendant say, "You shouldn't have gone to that party," and heard the victim say, "Look what you've done to my face." McPhatter and Harper testified that as the night went on, the defendant continued to argue, but the victim stopped talking and only cried. McPhatter testified that when he left his apartment at 5:30 a.m., he could still hear the defendant arguing and the victim crying. Similarly, when Harper left the apartment between 6:00 and 6:30 a.m., she could still hear the defendant arguing and the victim "whimpering." Linda Baldwin, an upstairs neighbor, testified that by 7:30 a.m., there were no noises coming from the apartment occupied by the defendant and Mitchell.

Approximately seven hours later, the defendant called 911 from his apartment. He told the dispatcher that Mitchell had collapsed, that he could not wake her and that she was breathing lightly. The victim was not breathing when paramedics arrived, she had no pulse and her neck and arms were stiff. Defendant told the paramedics that Mitchell had been assaulted around 6:00 p.m. the night before at the school where she was employed as a teacher. The paramedics called the police.

Officers M.L. Hayes and J.A. Pickett, Jr., of the Durham Police Department arrived at the defendant's apartment around 3:00 p.m. The defendant told Officer Hayes that he and Mitchell had been fighting all night. Defendant also told the officers that Mitchell had come home around 8:00 p.m. and stated that she had been attacked and could not breathe. At trial, however, the State presented evidence that at about 8:00 p.m., Mitchell was seen parking her car and that she looked normal, had no visible injuries, was not bleeding and had no trouble walking. The State also presented evidence from a co-worker who observed Mitchell shopping at a grocery store around 11:55 p.m. The co-worker noticed nothing strange about Mitchell's appearance or actions and testified

that Mitchell was not crying and appeared to be in good health.

Dr. John Butts, Chief Medical Examiner of the State of North Carolina, performed an autopsy on the victim. Dr. Butts' examination revealed, among other injuries, bruising on either side of the eyes, behind the right ear, on the lower part of the neck and over the front part of the skull. There was a laceration on the top of the head that extended into the deeper skin tissue that covers the skull. There were multiple bruises on the upper and mid-back, as well as extensive bruising of the right side and back, upper left arm and elbow, buttocks, back of the right thigh and all along the front part of the legs. The victim's skin was torn and scratched in several places. One back left rib was broken in two places, and ribs eight through eleven on the right side in the back were broken. One of the victim's ribs punctured the right lung, causing it to collapse and causing bleeding into the chest cavity. Dr. Butts characterized the wounds to the hands and forearms as defensive wounds from fending off her assailant's blows.

Dr. Butts testified that, in his opinion, Jocelyn Mitchell was struck dozens of times, causing her tissues to rupture and bleed into the muscles and fat beneath her skin. Further, some of her fat was broken up by the blunt-force trauma. The fat liquified and flowed into the victim's lungs, causing hypoxia, a lack of oxygen to the tissues. The overall process of internal bleeding, loss of blood to the tissues, collapse of the lung and fat in the lungs gradually resulted in loss of consciousness, coma and then death. Dr. Butts further testified that the victim's injuries would have been very painful, would have affected the victim's ability to move or walk and eventually would have incapacitated her.

*State v. Stroud*, 478 S.E.2d 476, 477-78 (N.C. 1996).

At the conclusion of Stroud's trial, the judge charged the jury with determining whether Stroud committed murder, in either the first or second degree, and kidnapping in the second degree. The judge

instructed the jury that it could find Stroud guilty of first degree murder under three theories: (1) "[o]n the basis of malice, premeditation and deliberation," (2) "[u]nder the first degree felony murder rule," or (3) "[o]n the basis of first degree murder by torture." The judge explained that conviction of murder by torture requires proof beyond a reasonable doubt that (1) the defendant intentionally tortured the victim, and (2) the torture proximately caused the victim's death. He also instructed the jury that "[t]orture is the course of conduct by a person which intentionally inflicts grievous pain and suffering upon another for the purpose of punishment, persuasion, or sadistic pleasure."

The jury found Stroud guilty of first degree murder and second degree kidnapping. In a special verdict, the jury indicated that it based its murder verdict on felony murder and torture — it did *not* convict Stroud on "the basis of malice, premeditation and deliberation."[1] Following the jury's recommendation, the judge sentenced Stroud to death.

Stroud appealed. The Supreme Court of North Carolina affirmed the convictions and sentence, *Stroud*, 478 S.E.2d at 481, 483, and the Supreme Court of the United States denied Stroud's petition for writ of certiorari. *Stroud v. North Carolina*, 522 U.S. 826 (1997). A North Carolina court denied Stroud post-conviction relief. Stroud then filed this petition for a writ of habeas corpus, which the federal district court denied. Concluding that Stroud had "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2) (2000), with respect to the state court's denial of his challenge to the adequacy of notice provided by the short-form murder indictment, we granted Stroud a certificate of appealability as to this issue.

---

[1]Stroud contends, without contradiction from the State, that despite his conviction for felony murder and kidnapping, the asserted deficient notice of murder by torture prejudiced him because "[i]f the jurors had not had the choice of murder by torture, under North Carolina law the kidnapping charge could not have been used as an aggravator in the sentencing phase." Brief of Petitioner at 59.

II.

Stroud asserts that, in violation of the Sixth and Fourteenth Amendments, he "had no notice in pre-trial hearings" or "during trial before the charge conference . . . that he could be convicted of murder by torture." Reply Brief at 3.

The state court, on post-conviction review, rejected this claim on the merits with little discussion. Under federal law, we too must reject this claim unless the state court's "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (2000). Given this stringent standard of review, Stroud's claim fails.

A.

The State maintains that Stroud's sole challenge is to the indictment's failure to include the elements of murder by torture. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Jones v. United States*, 526 U.S. 227 (1999) (holding that elements of a crime must be charged in the indictment and proven beyond a reasonable doubt). *Hartman v. Lee*, 283 F.3d 190 (4th Cir. 2002), forecloses that challenge. There we held that because "under North Carolina law, there is only one common law crime of murder, which by statute is divided into two degrees, . . . a short-form indictment that alleges the elements of common law murder is sufficient to satisfy the demands of the Sixth and Fourteenth Amendments." *Id.* at 198-99; *see also Allen v. Lee*, 366 F.3d 319, 323-24 (4th Cir. 2004) (en banc).[2]

---

[2]In 1893, the State codified the common law crime of murder:

All murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetuate [perpetrate] [enumerated felonies] shall be deemed to be murder in the

Although neither *Hartman* nor *Allen* involved convictions based on murder by torture, *Hartman*'s reasoning inescapably controls such convictions. In *Hartman*, after careful review of relevant state cases, we rejected the argument that first and second degree murder are "distinct" crimes in North Carolina. 283 F.3d at 194. We concluded that the North Carolina legislature, like those in other states, codified "the single, common law crime of murder into two degrees *without* creating any new offense." *Id.* at 198. We held that the short-form indictment satisfied constitutional requirements because it listed all of the elements of the only murder offense recognized under North Carolina law. *Id.* at 198-99. Thus, premeditation, the "element" that Hartman contended had to be charged in the indictment, merely constituted a means of committing the "single common law crime of murder," not an element of a separate offense. *Id.* at 198-99 & n.6. Applying the *Hartman* rationale here, we must similarly hold that under North Carolina law, murder by torture is just another means of committing "the single common law crime of murder."

Consequently, to the extent that Stroud challenges the state court's rejection of his claim that the indictment omitted an "element" of an offense, his contention fails. The state court's rejection of that claim was neither contrary to, nor an unreasonable application of, clearly established federal law. The indictment stated every element of the charged offense — common law murder — and that is all that is necessary.

### B.

Stroud, however, also poses a somewhat different argument. He seeks to rely on fundamental due process principles set forth by the Supreme Court, which we reiterated in *Hartman*, but found not to

---

first degree. . . . All other kinds of murder shall be deemed murder in the second degree . . . .

Act of Feb. 11, 1893, §§ 1-2, 1893 N.C. Sess. Laws 76 (first alteration in the original). At the same time, the legislature preserved the short-form indictment now set forth in N.C. Gen. Stat. § 15-144. *See State v. Kirksey*, 42 S.E.2d 613, 615 (1947) (*quoting* Act of Feb. 11, 1893, § 3, 1893 N.C. Sess. Laws at 76-77).

assist Hartman himself. Stroud argues that these principles govern his case and render the North Carolina court's rejection of his post-conviction claim unreasonable under clearly established federal law.

In *Hartman*, we affirmed that "[e]lementary principles of due process require that an accused be informed of the specific charge against him," 283 F.3d at 194 (*citing Cole v. Arkansas*, 333 U.S. 196, 201 (1948)), and that "'[a] person's right to reasonable notice of a charge against him . . . [is] basic in our system of jurisprudence,'" *id.* (*quoting In re Oliver*, 333 U.S. 257, 273 (1948)). Reasonable notice "sufficiently apprises the defendant of what he must be prepared to meet." *Russell v. United States*, 369 U.S. 749, 763 (1962) (internal quotation marks omitted) (evaluating indictment). It has long been "fundamental in the law of criminal procedure . . . that the accused must be apprised . . . with reasonable certainty . . . of the nature of the accusation against him, to the end that he may prepare his defence." *United States v. Simmons*, 96 U.S. 360, 362 (1878) (evaluating indictment). We took great care in *Hartman* to stress that our holding did not undermine these fundamental principles.

In doing so, we noted that Hartman's claim was "entirely formalistic in nature" because he did not "contend, nor could he, that he did not receive *actual* notice that the State sought to convict him of first degree murder," only that the short-form indictment failed to provide such notice. *Hartman*, 283 F.3d at 194 n.3. Stroud seeks to distinguish his case on the ground that, unlike Hartman, his claim is *not* "entirely [or at all] formalistic in nature." Stroud contends that he lacked actual notice that he could be convicted of first degree murder on the basis of murder by torture. He claims surprise that materially prejudiced his opportunity to defend himself and compromised the reliability of the truth-seeking process. *See* Reply Brief at 24-28 ("As [Stroud's] attorneys [were] able to convince the jurors [Stroud] was not guilty of premeditation and deliberation, with adequate notice and preparation they may have been able to convince the jurors [Stroud] was also not guilty of murder by torture."). In sum, Stroud asserts that, unlike Hartman, his claim does not rest on the technicalities of short-form indictments, but on whether the short-form indictment would have "sufficiently apprise[d]" a reasonable person in his position "of what he must be prepared to meet." *Russell*, 369 U.S. at 764; *see also id.* at 763-64 (suggesting that when evaluating the adequacy of notice

contained in an indictment, substance, not form, is the focus of the underlying inquiry).

This argument has some appeal. *See Givens v. Housewright*, 786 F.2d 1378, 1379-81 (9th Cir. 1986) (granting writ on similar facts, but under a prior statute providing a more liberal standard of habeas review). Prior to today, we have upheld the constitutionality of North Carolina's short-form indictment only when the State has charged the defendant with first degree murder on theories of premeditation or felony murder. Prosecution on these theories is sufficiently commonplace that a reasonable defendant charged with common law murder would foresee that he might have to defend against them. In contrast, Stroud notes that prosecutions for murder by torture were exceedingly rare in North Carolina at the time of his trial, and that although two years passed between his indictment and trial, he received no notice prior to the jury charge conference at trial that he could be convicted on a theory of murder by torture. Indeed, the State had offered him a written plea agreement (which he did not accept) permitting him to avoid a death sentence by pleading guilty to *second* degree murder (necessarily excluding torture) and first degree kidnapping and serving a sentence of life plus forty years. Stroud contends that in these circumstances the short-form indictment failed to provide a reasonable defendant with constitutionally adequate notice of the need to defend against a prosecution of murder by torture.

Stroud, however, ignores a critical fact: the short-form indictment did cite the State's murder statute and thus notify Stroud — at least summarily — that he needed to defend against a charge of first degree murder on any or all grounds. *See* N.C. Gen. Stat. § 14-17 (Cum. Supp. 1991). What Stroud seems to ask us to hold is that the Constitution requires the prosecution to provide a defendant notice of the first degree *murder theory* it intends to pursue. In *Hartman*, though addressing more routine circumstances, we expressly rejected this contention, explaining that "the Constitution does not require the method by which the crime was committed to be alleged in the indictment." 283 F.3d at 194 n.3 (*citing Martin v. Kassulke*, 970 F.2d 1539, 1543 (6th Cir. 1992)).

In any event, Stroud cites no Supreme Court precedent that requires adoption of his position. As noted above, the Supreme Court

*has* held that Due Process and the Sixth Amendment require notice that is sufficient to allow a reasonable defendant to prepare for trial. *See Russell*, 369 U.S. at 764; *In re Oliver*, 333 U.S. at 273; *Cole*, 333 U.S. at 201; *Simmons*, 96 U.S. at 362. We recognize that *Apprendi* and its progeny may indicate that at some future time the Supreme Court will determine that the Constitution requires more notice than the indictment provided Stroud — but the Court has not yet done that.

We note that *Lankford v. Idaho*, 500 U.S. 110 (1991), on which Stroud most heavily relies, involves a somewhat similar claim of lack of notice in a capital case based in part on a rejected plea offer. *See id.* at 111, 119-21. But the *holding* in *Lankford* — that in the "unique circumstance" of that case (which differs markedly from that at hand) the petitioner received inadequate notice that he might receive a death sentence, *see id.* at 111, 127 — does not apply to or assist Stroud. Stroud indisputably *did* receive notice that he faced a death sentence.

The lack of a controlling Supreme Court precedent is fatal to Stroud's habeas claim before us, for the Court has directed that only "holdings, as opposed to . . . dicta" constitute "'clearly established Federal law, as determined by the Supreme Court of the United States,'" for federal habeas purposes. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (*quoting* 28 U.S.C. § 2254(d)(1) (1994 ed., Supp. III)). It might be wise to extend *Lankford*'s rationale to cover circumstances like Stroud's — but we must wait for the Supreme Court to make that choice.

Absent factual error (which is not at issue here), only if a state court renders a decision that is "contrary to" or "involve[s] an unreasonable application" of a Supreme Court *holding* can a petitioner obtain federal habeas relief. *Id.*[3] We cannot say the state court's rejec-

---

[3]Congress enacted this rigorous standard when it amended § 2254 in 1996 as part of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214. Notably, when the Ninth Circuit granted habeas relief on a claim similar to Stroud's, it did so under § 2254 as it existed prior to this amendment. *See Givens*, 786 F.2d at 1380-81. The prior version of § 2254 allowed for "independent review" by the federal courts. *See Williams*, 529 U.S. at 403. For this reason, *Givens* provides little aid to Stroud.

tion of Stroud's claim was "contrary to," or "involved an unreasonable application" of, clearly established federal law, as determined by the Supreme Court.

## III.

For all of these reasons, we affirm the district court's dismissal of Stroud's petition for writ of habeas corpus.

*AFFIRMED*